# Richmond.

## COMMONWEALTH V. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD CO.

### January 12, 1911.

1. TAXATION—*Petition for Relief—Defenses—Pleadings.*—On the petition of a railroad company for relief from a franchise tax, on the ground that its charter exempted it from any public charge or tax whatever, it is entirely competent for the Commonwealth to show that the company had accepted an amendment to its charter whereby it had surrendered its exemption from taxation. No forms of pleading are prescribed by statute in such proceedings, and strict technical rules of pleading are inapplicable.

2. CORPORATIONS—*Charters—Amendments—Acceptance by Implication.*—An act of Assembly which grants to such railroad companies as accept its provisions unusual and ·valuable privileges, which constitute amendments to their charters, may be accepted by implication from acts of a company in availing itself of the privileges tendered by the act, and such acceptance will carry with it all the burdens attaching thereto.

3. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY—*Taxation Exemption—Charter Amendments—Acceptance by Implication.*—If it be conceded that, by virtue of its charter, the Richmond, Fredericksburg and Potomac Railroad Company was not liable to a franchise tax prior to July 10, 1902, yet having thereafter accepted the new and enlarged powers tendered by the act of Assembly of April 2, 1902, not previously possessed by it, by which it was enabled to change the location of its line, and by which its powers of eminent domain were materially enlarged and extended, such acceptance constituted an amendment of its charter, and the company thereby surrendered its exemption from taxation in pursuance of section 158 of the Constitution declaring that any corporation which should thereafter accept, or effect, any amendment or extension of its charter should be conclusively presumed to have thereby surrendered every exemption from taxation or other privilege not enjoyed by other like corporations.

4. RAILROADS—*Charter Amendments—Power of Directors to Accept.—* The directors of a corporation are generally merely its managing agents for the purposes of its business, and it may well be doubted whether the directors of a railroad company have power to accept such radical amendments of the charter of their company as involve an extended change in the location of its roadbed, and the liability of the company for taxes from which it was previously exempt, in the absence of power specially conferred by the legislature. In the case at bar, no such power was conferred. On the contrary, it was practically denied by the charter of the company. The amendment involved not only the building of many miles of lateral or branch road, but a radical change in the location of the road, and the abandonment of its existing line and depots, which were matters to be determined by the stockholders, and not by the directors.

5. CORPORATIONS—*Void Acts of Directors—Ratification by Stockholders.—* It is not competent for stockholders, by subsequent ratification, to validate an act of its board of directors, which was illegal and void at the time it was done. The act to be ratified must be voidable merely and not absolutely void. This well settled principle of the law of agency is as applicable to corporations as to individuals.

6. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY— *Amendment of Charter—Acceptance by Implication—Taxation.—* Under the facts and circumstances of the case at bar it is *held:* That the amendments to the charter of the Richmond, Fredericksburg and Potomac Railroad Company, tendered to the company by the act of April 2, 1902, were never accepted by it till after July 10, 1902, when the Constitution became effective; that the action taken by the stockholders in general meeting, November 17, 1902, and January 16, 1903, together with the radical changes in its road made in pursuance thereof, constituted an implied acceptance of the amendments to its charter tendered by the act of April 2, 1902, and that by such acceptance the company thereby, in accordance with the terms of section 158 of the Constitution, surrendered every exemption from taxation which it might theretofore have claimed under its charter.

Error to a judgment of the Circuit Court of the city of Richmond, on a petition to be relieved from an erroneous tax. Judgment for the petitioner. Commonwealth assigns error.

*Reversed.*

The opinion states the case.

*Samuel W. Williams, Attorney-General,* and *William A. Anderson,* for the Commonwealth.

*Braxton & Eggleston,* for the defendant in error.

HARRISON, J., delivered the opinion of the court.

The Constitution and statutes of Virginia direct the imposition of an annual State franchise tax on every railway corporation chartered in this State, including any such as is exempt from taxation as to its works, visible property or profits. Va. Const., sec. 177, 178; Va. Code, 1904, pp. 2205-7.

In accordance with these provisions, such a franchise tax for the year 1907 was assessed against the Richmond, Fredericksburg and Potomac Railroad Company. Thereupon, the company filed, in the Circuit Court of the city of Richmond, its petition, praying for relief upon the ground that by section 25 of its charter (Acts 1833-4, p. 127) it was exempt from any public charge or tax whatsoever; that the exemption mentioned was a contract on the part of the Commonwealth, and the enforcement of the tax would be a violation of section 10 of article 1 of the Constitution of the United States, which provides that, "No State shall pass any law impairing the obligation of contracts"; and that, therefore, the provision of the State Constitution and the act of the legislature, directing such tax, are null and void in so far as they are sought to be enforced against said company.

To this petition of the railroad company for relief from the franchise tax assessed against it, the Commonwealth, by her Attorney General, filed a demurrer and answer. The ground of the demurrer was, that section 25 of its charter did not exempt the company from the franchise tax imposed by the Commonwealth; that only the particular tangible property men-

tioned in section 25 of the charter and the profits accruing therefrom were exempt from taxation; that the franchise of the company was a species of property, distinct and different from the tangible property defined and enumerated in the exemption clause; and that neither the franchise nor the profits accruing therefrom are thereby exempted from taxation. The defense set up by the Commonwealth in its answer was that, by section 158 of the Constitution of Virginia, effective July 10, 1902, it was provided that any corporation which should thereafter accept, or effect, any amendment· or extension of its charter should be conclusively presumed to have thereby surrendered every exemption from taxation or other privilege not enjoyed by other like corporations; that by act of the General Assembly, approved April 2, 1902 (Acts 1901-'2, p. 790), section 1089 of the Code was amended so as to confer upon such railroad companies as accepted and availed themselves of its provisions, certain very valuable and important privileges not theretofore possessed by the Richmond, Fredericksburg and Potomac Railroad Company under its charter: that after the 10th of July, 1902, when the Constitution and section 158 thereof became effective, the company availed itself of the provisions of such act by abandoning its original right of way for long distances between its termini, and building its road on the new location which it had acquired, and thereby accepted and effected an important amendment of its charter, thus surrendering, as provided by section 158 of the Constitution, any claim which it may have theretofore had to any immunity or exemption whatever not enjoyed by other corporations of like character.

The railroad company objected to the filing of this answer by the Commonwealth, insisting that the question, whether or not it had accepted an amendment to its charter, and thereby surrendered its exemption from taxation could not be

raised or considered in this case. This objection was properly overruled.

No forms of pleading are prescribed by statute in these proceedings, and strict technical rules in such a case are out of place. It was clearly competent for the Commonwealth to show that the company was not exempt from taxation, because it had surrendered such exemption, and it is inconceivable how the company could be prejudiced by meeting that issue and having it determined in this case. The company was asserting its claim to exemption from taxation in this proceeding, and the Commonwealth had the right to justify its assessment of the franchise tax upon any legal ground that existed. In no other way could the just legal rights of the parties, with respect to the tax, have been settled in this proceeding.

The circuit court overruled the demurrer filed by the Commonwealth and gave judgment in favor of the railroad company, holding that under its charter it was exempt from the tax sought to be imposed upon it and that the enforcement of such tax would be a violation of section 10 of article 1 of the Constitution of the United States.

The question raised by the demurrer is an interesting and important one, but in our view there is no occasion for its decision in this case, for if the construction placed upon section 25 of the charter by the circuit court be sound, and the company thereby exempt from the payment of a franchise tax, it could not prevail. because in our opinion the company has surrendered its right to such exemption in consideration of very extended and valuable privileges acquired by it under the act of April 2, 1902, which privileges constituted amendments to its charter and were not accepted by the company until after July 10, 1902, and were, therefore, availed of with all the burden attaching thereto by virtue of section 158 of the Constitution of Virginia, which became effective July 10, 1902.

The act of April 2, 1902, granted to such railroad com-

panies as accepted its provisions unusual and valuable privileges. It empowered a company availing itself of its provisions to change the location of its line of railway, provided the new line should not be located at a greater distance than two miles from its old line, nor more than one mile from any established station on its old line of road, subject to the conditions specified in the act. Its right to exercise the power of eminent domain was materially enlarged and extended beyond that right as prescribed in its charter. If the company accepted these new and enlarged powers and privileges after July 10, 1902, when the Constitution became effective, it cannot be questioned that such acceptance made them amendments to its existing charter, and that the company thereby surrendered its exemption from taxation as provided by section 158 of the Constitution.

It is not contended that the acceptance was evidenced by any express resolution of the company. It is, however, claimed that such acceptance was by implication from acts of the company in availing itself of the privileges tendered by the act of April, 1902. The record shows that, among other acts, the company has built at least twenty-six miles of new road on a new right of way, which it had no power to do under its old charter. The crucial question, the determination of which will settle this controversy, is, therefore, when did the company by any lawful and binding action avail itself of, and thereby accept, the amendments to its charter rights and privileges tendered by the act of April 2, 1902?

It is insisted on behalf of the company that the amendments tendered by this act were accepted, by implication, prior to July 10, 1902, and in support of this contention the company relies on the action taken at the annual meeting of its stockholders, held November 18, 1901, when the following report of the board of directors was approved by a unanimous vote: "This line, the common servitor of all, lies wholly within Virginia. It has, in the opinion of the board, its course

now plainly indicated. That course is to fit itself with due dispatch for the increased work before it. In construction and equipment it should occupy a place in the front rank. Its alignment should be improved, its grades modified, and the construction necessary to those ends should be for a second track which must, throughout its length, at no distant day be added."

This statement in the report of the president and directors was nothing more than an expression of opinion by them that the company should occupy a place in the front rank and suggesting the improvements that should be made to that end. There was no authority given by the stockholders to carry out the suggestions made, and if such authority had been given it could only have referred to improvements to its existing right of way. In November, 1901, the company had no power but that conferred by its original charter, which did not authorize it to abandon any part of its old line and construct another upon a new and different right of way. The action of the stockholders in approving these suggestions of the president and directors cannot be construed as an acceptance of the provisions of an act which was not then in existence.

In January, 1902, the board of directors of the company adopted the following resolution: "Resolved, that it is the sense of this board that the time has come when we should construct a second track, and the president be, and is, hereby authorized at the proper time to proceed with such construction, including advisable changes in alignment and grades, reporting from time to time to the board."

Under its original charter the company had the power to build as many tracks as it might please upon its right of way acquired under that charter: and as its charter was, in January, 1902, its only authority, the language of the resolution, "that the time has come when we should construct a second track," could only have referred to double-tracking its then existing right of way. This is the only reasonable

construction to be put upon the resolution. It certainly cannot be held to be an acceptance of the provisions of an act not in existence for more than two months thereafter.

In further support of the contention that there was an implied acceptance by the company of the provisions of the act of April 2, 1902, prior to July 10, 1902, the company relies upon the action of its board of directors taken May 27, 1902, and June 26, 1902. The action taken May 27, 1902, was as follows: (1) "Be it resolved, that it is considered advisable by the board of directors of this company to make the changes hereinafter described in the location of parts of the line of its railroad in order to straighten or improve the same, and to shorten the distance between its existing termini." (2) "Be it resolved, that the president be directed to acquire the land necessary to make the changes in the location of the line of this company as directed in the preceding resolution, by purchase or condemnation as may be found most expedient." Then follows a description of the changes contemplated by this action of the board.

The action taken June 26, 1902, was as follows: "Resolved, that in order to straighten and improve its line, and to shorten the distance between its existing termini, it is considered desirable by the board of directors of this company to make the changes in the location of its road, beginning at a point near the 20th mile post and extending northwardly to a point near the 22nd mile post, as described more fully in the map marked Line D, made by John Field, bearing date the 26th day of April, 1902, and a copy of which is before the board and is to be filed with the record of this meeting. That the president be directed to acquire the land necessary to make the changes in the location of the line, by purchase or condemnation proceedings as may be found most expedient."

These resolutions of the board of directors, on which the company relies as being an implied acceptance of the act of April 2, 1902, makes no reference whatever to the act; nor does

the action of the board of directors at any time prior to July 10, 1902, authorize a change in the location of the company's railway except for the portions of the line mentioned therein; nor do they say anything about an abandonment of its old line. It is clear from the record that no change of location was made, or any other act done under these resolutions that could be regarded as an implied acceptance of the provisions of the act of April 2, 1902. The report of the company for the fiscal year ending June 30, 1902, shows an expenditure of $37,660.99 for "New construction second track;" but there is no evidence tending to show that the double-tracking for which the item mentioned was expended was on a different location from the old line, or that it was not an improvement lawfully made by the company upon its old right-of-way. The facts were in the possession of the company and it could have readily shown that this item of expenditure was on account of a new line involving an abandonment of the old if such had been the fact.

The action of the board of directors in May and June, 1902, can only be regarded as a declaration of approval of the scheme therein suggested. Nothing was done in pursuance of that action amounting to an implied acceptance of amendments to the charter of the company. The action was not binding upon any one. The company could have repudiated it and the directors themselves could have abandoned such action and no one could have complained. If these resolutions had been adopted after July 10, 1902, the State could not have levied taxes upon the property of the company relying alone upon such resolutions as an acceptance of amendments to its charter whereby the company had surrendered its existing exemption from taxation. In so far as the directors declared that the changes of location defined in their resolutions were desirable, and approved them, they acted within their powers. The directors of a corporation are generally merely its managing agents for the purposes of its business, and it may well be doubted whether they have power to accept such radi-

cal amendments to the charter of their company as are tendered by the act of April 2, 1902, unless power thereto has been specially conferred upon them by the legislature. 10 Cyc. p. 214. In this case there was no such legislative authority. On the contrary, section seven of the charter is practically a denial of any such power in the board of directors. It provides: "That no branch or lateral railroad exceeding two miles in length shall be commenced until the expediency of making the same shall have been determined in a general meeting of the stockholders, by two-thirds of the votes which could be legally given in favor of the same." It would seem to be clear from this provision of the charter, which is in part the law of the company's life, that the board of directors were without power to accept amendments to the charter which involved not only the building of many miles of lateral or branch road, but a radical change in the location of the road, and the abandonment of its existing line and depots. Certainly the directors were powerless to give any efficacy to their resolutions by commencing such an extended and radical change in the location of the road in the face of the charter which expressly provided that no branch or lateral railroad exceeding two miles in length should be commenced until the expediency of making the same should be determined in a general meeting of the stockholders, by two-thirds of the votes that could be legally given in its favor.

We are of opinion that the board of directors had no power under the charter of the company, which was at the time its sole authority, to accept the amendments in question, and were without authority to commence the work of carrying out the extensive changes contemplated by the act of April 2, 1902, until the expediency of doing so was determined in a general meeting of the stockholders by two-thirds of the votes that could be legally given in favor thereof. The action of the board of directors in May and June, 1902, was, therefore, void, in so far as that action can be regarded as contemplating any such purpose.

It is insisted that the action of the board of directors in May and June, 1902, was ratified by the stockholders of the company at their general meeting in November, 1902, and that such ratification related back and made the action of the board valid and effective as of the date it was expressed by the resolutions of the board. The report of the board of directors to the meeting of stockholders in November, 1902, does not make the slightest reference to the resolutions adopted by the board in May and June, 1902, nor does any action of the stockholders at that meeting make any allusion to such resolutions. If, however, these resolutions had been mentioned and approved by the stockholders, such action would not have had the effect of validating them, because the action in question of the board of directors was void in so far as it involved an acceptance of the amendments tendered by the act of April 2, 1902. It was not competent for the stockholders, by subsequent ratification, to validate an act of its board of directors which was illegal and void at the time it was done. A void act cannot be validated by subsequent ratification. The act to be ratified must be voidable merely and not absolutely void. This well settled principle of the law of agency is as applicable to corporations as to individuals.

The record shows that not until November 17, 1902, and January 16, 1903, did the company, in general meeting of its stockholders, take action approving the recommendation of its directors involving the building of twenty-six miles of new road on a different location, and abandoning to that extent the old right of way. By the action of January 16, 1903, the money was appropriated for the purpose of making the changes and building the new road. Under this action of the company the new construction was begun for the first time, and rapidly carried on at a cost of more than $3.000.000 as of June 30, 1907. Under its original charter these changes could not have been effected and the new road built. It was only by virtue of the act of April 2, 1902, that the company

was enabled to accomplish these radical changes in its former situation.

Another important amendment to its charter tendered to the company by the act of April 2, 1902, was the privilege of invoking the power of eminent domain in accordance with the provisions of chapter 46 of the Code. It could have acquired lands for its lawful uses in the way provided in its charter. There were, however, decided advantages to be derived from proceeding under chapter 46 of the Code, particularly as to the larger quantity of land that could be condemned, and as to the more desirable method of procedure. In condemning the lands necessary for the changes made in its right of way, the company availed itself of the privilege tendered by the act of April 2, 1902, and proceeded under chapter 46 of the Code, thereby acquiring more land than it could have done under its charter, and thus, by implication, adopting the privilege as an amendment to its charter.

In conclusion, we are of opinion that under the facts and circumstances of this case, the amendments to its charter, tendered to the Richmond, Fredericksburg and Potomac Railroad Company by the act of April 2, 1902, were never accepted by it until after July 10, 1902, when the Constitution became effective; that the action taken by the stockholders, in general meeting, November 17, 1902, and January 16, 1903, together with the radical changes in its road already mentioned, made in pursuance of that action, constituted an implied acceptance of the amendments to its charter which were tendered by the act of April 2, 1902; and that by such implied acceptance of those amendments the company thereby, in accordance with the terms of section 158 of the Constitution, surrendered every exemption from taxation which it might theretofore have claimed under its charter.

The judgment complained of must, therefore, be reversed, and this court will enter such judgment as the circuit court ought to have rendered.                                    *Reversed.*