## DREW ET AL. v. BECKWITH, QUINN & CO. ET AL.

(No. 2187; June 11, 1941; 114 Pac. (2d) 98)

(Rehearing denied June 29, 1941)

142

For the appellants, there was a brief and an oral argument by *Louis Kabell, Jr.* of Evanston.

144

146

For the respondent P. W. Spaulding, there was a brief and argument on his own behalf.

*W. A. Muir* in reply.

BLUME, Justice.

This is an action brought by the plaintiffs, minority stockholders in Beckwith, Quinn and Company, a corporation, on behalf of themselves and others similarly situated, to have the affairs of that corporation wound up, and have a receiver appointed, claiming that the term of existence of the corporation has expired, and that the directors have mismanaged the affairs thereof. The defendants are the corporation, the directors and certain stockholders thereof. After issues joined, and trial had, the court dismissed the action at the costs of plaintiffs, and from that judgment the latter have appealed.

The corporation was organized on October 19, 1885, under the laws of Wyoming Territory, for a period of fifty years, the utmost limit of time for which a corporation was authorized by law to be organized. Its property consists mainly of 14,000 acres of land, appurtenances thereto, and personal property held in

connection therewith, situated in what is now Lincoln County, Wyoming. Its principal office is located at Evanston, Uinta County, which county, prior to 1911, included the territory now included in Lincoln County. In 1890, after the organization of the territory into a state, the corporation duly accepted the constitution of this state. Ever since its organization, it has conducted its business for which it was organized, and has continued to do so to the present time. Its capital stock consists of 5333 shares, of the par value of $100 each, more than two-thirds of which were, up to the spring of 1939, owned by certain stockholders residing in and about the city of Chicago, or east thereof, herein briefly called Chicago stockholders. The plaintiffs are owners of 269 shares. The corporation has never paid any dividends. At its annual meeting held in the spring of 1935, after due notice given, a resolution was adopted by representatives of more than two-thirds of the stock, and without a dissenting vote, directing the directors of the corporation to extend the life of the corporation. No specific law to that effect existed till 1911. In that year the legislature enacted Chapter 32 of the Session Laws of that year, (now Section 28-159, Rev. St. 1931), reading as follows:

"Any corporation organized under any law of this state, may, upon, or within one year before the expiration of the time of its existence, be continued in its existence, and have a renewal of its franchise, upon the same terms and conditions, and the same privileges as specified in the original certificate of incorporation, or amendments thereto, for such period as may be specified in its certificate, by filing a certificate, or certificates, with such officer or officers, as provided by law in original incorporation, which said certificate, duly authorized by the board of directors of such corporation, must be duly acknowledged by the president or vice president, and by the secretary, or assistant secretary, of such corporation, and shall contain a statement that such corporation desires to continue its

existence for a period of years specified therein, which shall not exceed the period now authorized by law in case of original corporation, and shall further contain the certificate, signed by such officers that the said certificate is filed in accordance with a resolution of the board of directors of such corporation. The same fees, provided by law to be paid, in case of original corporation shall be paid at the time of the filing of such certificate. Provided, however, that this section shall not apply to any public utility corporation, having or operating under, or in connection with any franchise, from any municipality in the state."

The above resolution was carried out, as directed, by the board of directors of the corporation, and the proper officers thereof, and the corporate existence was extended for fifty years. The proper certificate was filed in the office of the Secretary of State, and in the county of Uinta, before October 19, 1935, and in Lincoln County, Wyoming, on October 26, 1935.

For many years prior to 1935, the corporation, in view of the fact that it was unable to make profits which would enable it to pay any dividends, had made efforts to dispose of its property, pricing it at more than $100,000. It was never able to do so. Then in 1936 the Chicago stockholders, through their agent, Mr. Clay Judson, one of the defendants herein, entered into negotiations with the defendant Henry D. Moyle for the sale of their stock at $14.00 per share. An option-contract to that effect was drawn, and in it Moyle agreed that he would purchase at the same price the stock of all other stock-holders who might choose to sell. The option expired on February 1, 1939. The negotiations were open and above board, Judson corresponding with Mr. P. W. Spaulding, attorney at law at Evanston, Wyoming, who represented a Mrs. Quinn, a minority stockholder, and perhaps others, and keeping him advised of the progress of the negotiations. Apparently because Moyle was unable to raise the money, the option was not exercised. The Chicago

interests, thereupon, entered into negotiations with the defendants Carlisle and Johnson for the purchase of their stock at $14.00 per share, payable in five installments. Mrs. Quinn, one of the minority stockholders, objected to some of the terms of the contract, and Mr. Judson, accordingly, as he testified, did not have inserted in that contract a provision similar to that which had been inserted in the Moyle contract, namely, that Carlisle and Johnson would also buy the shares of the minority stockholders at the same price. Terms were inserted in the contract, however, protecting the interests of all the stockholders of the company. The negotiations with Carlisle and Johnson, too, were open and above board, Mr. Spaulding being advised in connection therewith from time to time, as shown by the correspondence in the record. The contract is dated April 4, 1939. The annual stockholders' meeting had been called for March 6, 1939, but was adjourned from time to time, until it was held on April 3, 1939, after the sale of the stock pursuant to the foregoing contract was actually consummated, and at that time, the purchasers of the stock, Mr. Carlisle and Mr. Johnson, Henry D. Moyle, and the wife of Carlisle were elected as directors of the corporation, as representing approximately two thirds of the stock, and Mr. Spaulding was elected director to represent minority stockholders. At that time, Mr. Spaulding asked the defendant Carlisle, as to whether he would purchase the minority interests in the corporation. Carlisle refused, or at least did not give his assent. Mr. Spaulding thereupon insisted that he be elected as one of the directors to represent the minority interests. He also, as he testified, raised the question as to the expiration of the life of the corporation. This action was commenced the following June. Some other facts will be mentioned later.

■ Counsel for the appellants argue and contend

that when the legislature in 1911 provided that "any corporation organized under any law of this *state"* might prolong its existence in the manner therein stated, it did not include corporations organized while Wyoming was a *territory,* and they treat the territory in relation to the state substantially as a foreign jurisdiction. But we think that the kinship is much closer than that. Wyoming existed in territorial days. It still exists, as it did then. We have but changed the governmental agencies. The body of the people of the territory continued as the body of the people of the state. We are not inclined to consider the pioneers of our earlier days as citizens of a foreign state. So far as legislation is concerned, Wyoming, by the act organizing it as a territory, was a self-governing community. The members of the legislature were inhabitants thereof and were elected by the people then as now. The change from territorial government to state government was similar to the change of a municipality from a town to a city. The fundamental law of the latter is different, or may be different, from the fundamental law of the former. It is held that in the case of such change, the ordinances of the town will remain in force and effect, except as they may be inconsistent with the fundamental law. Ritchie v. South Topeka, 38 Kans. 368, 16 Pac. 332; 43 C. J. 167. There is, in the main, but a change in the name. The identity of the community remains as before. It is not necessary to determine whether or not the laws of the territory would have remained the laws of the state in the absence of affirmative provisions to that effect, for there are such affirmative provisions. We merely point out that in construing our laws, it would be inappropriate to emphasize the passing of Wyoming from a territory to a state, except where the difference in the form of government makes that necessary, and we should not overlook the fact that we are still the same community

which existed prior to statehood, and that many laws enacted during territory days are with us still. Congress in its enabling act provided that "all laws in force in said territory at the time of its admission into the Union, until amended or repealed, shall be in force in said state except as modified or changed by this act or by the constitution of the state." Section 1 of Article 21 of the Constitution of the state provides that in order that no inconvenience might arise from the change of government "all rights of individuals and of bodies corporate shall continue as if no change had taken place in this government," and Section 3 of the same article provides that "all laws now in force in the territory of Wyoming, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature." Stated in different phraseology, the laws of the territory became laws of this state. The corporation here in question was organized under one of these laws, and we are unable to see how it can be said that it was intended to be excluded by the legislative act of 1911. It is stated in Fletcher, Cyclopedia of Corporations, Section 123, that "upon the admission of a territory into the Union as a state, corporations theretofore created by the territory must thereafter be considered as corporations of the state to the same extent as if they had derived their corporate existence directly from the state." See also 18 C. J. S. 410. In Kansas P. R. Co. v. R. Co., 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794, the court stated:

"The admission of Kansas as a state into the Union, and the consequent change of government, in no respect affected the essential character of the corporation or their powers or rights. They must, after that change, be considered as corporations of the state, as much so as if they had derived their existence from its legislation."

The statement was approved in Shulthis v. McDougal, 225 U. S. 561, 32 Sup. Ct. 704, 56 L. Ed. 1205.

It is true that when the corporation in question was organized, the law under which the organization took place was not then a law of the state, and that fact renders the first sentence of the law of 1911 perhaps somewhat equivocal. However, if the time element of organization had been deemed important by the legislature, that fact could have been easily expressed; for instance, by stating that "any corporation organized under any law of this state *since statehood."* But there is nothing to indicate that the legislature had the time element in mind, and we accordingly think that the phrase "any law of this state" means nothing more or less than "any law of Wyoming."

Section 34 of Article 1 of the Constitution provides that "all laws of a general nature shall have a uniform operation," and since corporations organized during territorial days became corporations of the state, it may at least be questioned whether the statute of 1911 would not have violated this constitutional provision, if it had excluded them, and had been made applicable only to corporations organized since statehood.

Counsel call attention to the difference in the provisions of Section 5 and Section 16 of Article 10 of the Constitution. Section 5 provides: "No corporation organized under the laws of Wyoming territory or any other jurisdiction than this state, shall be permitted to transact business in this state until they have accepted the constitution of this state and filed such acceptance in accordance with the laws thereof." Section 16 provides that "no railroad or other transportation company or telegraph company in existence upon the adoption of this constitution shall derive the benefit of any future legislation without first filing in the office of the Secretary of state an acceptance of the provisions of this constitution." Counsel argue that in

view of the fact that the corporations mentioned in Section 16 could receive the benefit of future legislation upon acceptance of the constitution, and since that specific provision is not contained in Section 5, this indicates the intention of the constitution that corporations included within the latter section were not to receive the benefit thereof. It is rather peculiar that this difference should appear in the two sections. Counsel for the respondents attempt to explain it by the fact that in 1889 and 1890 the only railroad company in the state was the Union Pacific Railroad company, which at that time was a corporation organized under the laws of Congress. That does not, perhaps, fully explain the peculiarity, since reference is also made to "other transportation company and telegraph company." However, notwithstanding this peculiarity, the two sections are not in actual conflict. It can hardly be that the framers of the constitution intended that ordinary corporations, organized under the Wyoming territorial laws, should be beyond the reach of the legislature. The very fact that they were required to accept the constitution indicates the contrary, and if requirements could be made of them which might be burdensome, as doubtless is true, then no reason exists why other provisions, not burdensome, should be inapplicable to them.

■ The lands owned by the corporation are located in what is now Lincoln County, formerly a part of Uinta County. A copy of the resolutions and certificate of the directors extending the life of the corporation was not filed in Lincoln County until October 26, 1935, seven days after the original charter of the corporation had expired, and it is contended that by reason of that fact, the life of the charter was not continued. The proper papers had been filed in the office of Secretary of State and in Uinta County, which has been the principal office of the corporation since its beginning.

However, a duplicate of the certificate was required to be filed in every county in which the corporation does business. Sec. 28-101 and 159, Rev. St. 1931. The latter section provides that the certificates might be filed *"upon* * * * the expiration of the time of its existence."* That does not seem to require that it is absolutely necessary that the certificate must be filed in every county where the corporation does business before the original period expired, but seems to give some leeway. The filing in Lincoln County was made necessary only by reason, of the fact that the legislature took that county from what was originally Uinta County. We are inclined to think that there was a substantial compliance with the statute, and that the filing in Lincoln County a few days after October 19, 1935, was not fatal. The statute in Merges v. Altenbrand, 45 Mont. 355, 123 Pac. 21, to which counsel refer, is different from our statute.

■ The statute of 1911, as above indicated, authorized the extension of the life of the corporation in this case. It provides that at least the formal act of such extension must be performed by the board of directors and its officers. It is held that the directors (trustees) cannot make constituent changes unless they are authorized to do so by the charter or by the law of the state. 18 C. J. S. 476; Com. v. R. Co., 111 Va. 611, 69 S. E. 1070. In this instance, the law authorized such action. And while it may be open to question whether the particular method of authorization is the wisest, it was said in Polk v. Life Ass'n., 207 U. S. 310, 52 L. Ed. 222, 28 Sup. Ct. 65, 71, that "if the legislature has the constitutional power to authorize the change (in the charter) by a vote of the majority of the members, it has the power to authorize the change by a vote of a majority of the directors. The rights of a protesting member are no more impaired in one case than in the other." See also 13 Am. Jur. 232. The corporation,

156

however, evidently construed the act to mean and imply that at least a majority of the stockholders must assent thereto. Perhaps that is correct. See Railway Co. v. Allerton, 18 Wall. 233. Counsel for plaintiffs, however, argue that the original charter constituted a contract among the stockholders; that the life of the corporation was limited to fifty years; that this is part of the contract; that the extension of the life of a corporation is a fundamental change, and that the contract entered into cannot, as against any dissenting stockholder, be impaired in such case, in violation of constitutional provisions relating to impairment of contracts. Attention is called to Section 501 of Cook on Corporations (8th ed.), wherein the author states that "there is a strong tendency in the decisions, and a tendency which is deserving of the highest commendation, to limit the power of a legislature to amend a charter under the reserved power." It may be noted that in their contention, counsel for the plaintiff insist that such extension is detrimental to the interests of their clients. We may here pause to remark, that counsel do not seem to be entirely consistent in their arguments, for while they here speak of detriment, in their previous argument they treated it as a benefit, for they contrasted Sections 5 and 16 of Article 10 of the Constitution, contending that since the benefit mentioned in the latter is not mentioned in the former, the corporation here in question is not entitled to have its life extended under any law enacted by the legislature of the state. Counsel, accordingly, are at odds with themselves as to whether to call the act of 1911 detrimental or beneficial. The truth probably is that while at times it may prove detrimental, it is generally beneficial. Legislatures have from time to time enacted laws permitting the extension of the life of corporations, when no such laws existed previously, and this seems to indicate a general agreement as to the bene-

ficial effect of such laws. And parties are ordinarily not in position to complain of benefits which they receive. It is by no means certain that the law of 1911 is detrimental to plaintiffs, for the evidence herein indicates that whereas the last sale of stock in the corporation here involved brought $14.00 per share, the value thereof would, if the corporation should be held to have expired, be only $6.00 per share. It may be, of course, that plaintiffs prefer to receive $6.00 per share rather than to wait to see whether or not they would be able to get the actual value thereof, since that fact is not certain.

In Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629, it was held that the charter of a corporation constitutes a contract between the state and the corporation; between the corporation and its stockholders, and between the stockholders themselves, and that a material change could not thereafter be constitutionally made to impair this contract. That decision, probably, did not go so far as to hold that additional grants of power, concededly beneficial, and which the corporation might accept or reject at its option, would be invalid. It passed upon provisions which impaired the charter by compulsory changes therein. The decision led to the provision in the various states reserving to the state the power to alter or amend the charters, similar to our statutory and constitutional provisions. Fletcher, Cyclopedia of Corporations, Sec. 3658. At the time when the corporation here involved was incorporated, the statute, passed in 1876, provided that "the legislature may at any time alter, amend or repeal this chapter." Section 518, Rev. St. 1887, now section 28-135, Rev. St. 1931. That provision seems to have been overlooked by counsel for appellants. Moreover, the corporation accepted the constitution of this state in 1890, and thus became subject to the provisions of Section 1 of Article 10 of the Constitution, which

provides that "all laws relating to corporations may be altered, amended or repealed by the legislature at any time when necessary for the public good and general welfare." That would seem to be true at least in a case in which the corporation continued year after year, with the consent of its stockholders, to operate as a corporation of this state. Fletcher, Cyclopedia of Corporations, Vol. 7, page 827, section 3677; Perkins v. Coffin, 84 Conn. 275, 79 Atl. 1070. These provisions became a part of the charter of the corporation as effectually as though incorporated therein. 13 Am. Jur. 234; Lord v. Equitable Life Ass'n., 194 N. Y. 212, 87 N. E. 443; 22 L. R. A. N. S. 420. They gave specific authority, to which the incorporators impliedly assented, that the contract entered into by them with the state and the corporation, and between themselves, could be changed by the legislature, and by the acts of the stockholders or the authorized corporate officers pursuant thereto. Kreicker v. Naylor Pipe Co., 374 Ill. 364, 29 N. E. (2d) 502. It is, accordingly, not a valid argument that the contract herein was changed. However, it is generally agreed that the reserved power is not unlimited in its scope. Phillips Petroleum Corp. v. Jenkins, 297 U. S. 629, 56 Sup. Ct. 611; 13 Am. Jur. 237; Fletcher, supra, Sec. 3684. Hence the only valid argument herein is upon the question as to whether the extent to which the contract was changed, or rather was authorized to be changed, was justified. If there had been in existence at the time of the organization of the corporation a law which specifically authorized the extension of corporate life, then that law would have been a part of the contract, and such extension would have been lawful. McKemie v. Grocery Co., 146 Ga. 753, 92 S. E. 282; Smith v. Eastwood Wire Mfg. Co., 58 N. J. Eq. 331, 43 Atl. 567; Keetch v. Cordner, 90 Utah 423, 62 P. (2d) 273, 108 A. L. R. 52; Loeffler v. Federal Supply Co., 187 Okla. 373, 102 P.

(2d). 862. But there was no such statute, and the question is whether the reserved power under the constitution and statutes already mentioned is sufficiently broad and comprehensive for that purpose. Courts seem to be agreed that this power does not permit a change in the charter or articles of incorporation by subsequent legislation, as against the dissent of a stockholder, which is fundamental or unreasonable in its character; but if it is not fundamental or unreasonable, then the law authorizing it, and the action of stockholders or the proper officers of the corporation pursuant thereto, is not in violation of constitutional rights of the dissenter. Fletcher, supra, Sec. 3684; 18 C. J. S. 477; 16 C. J. S. 761. Courts have at times found it difficult to determine when a change is fundamental or otherwise. The only decision in point, so far as we have found, which upholds the contention of the plaintiffs herein, is by a Nisi court, namely, Pratt v. Building and Loan Association, 1 Colo. Nisi Prius Decisions 171. The case holds that the reserved power permits only legislation in favor of the public, and that a statute passed to permit the renewal of corporate life does not apply to corporations organized previously. The corporation in that case was organized for the period of twenty years. The court stated that "the time limited for its existence was of the very essence of the contract." Two of the judges dissenting in McKemie v. Grocery Co., supra, advanced the same argument. In that case, too, the company was organized to exist for 20 years. It may be conceded that opportunity for such argument is offered in a case where the corporate life is limited to so short a period. But suppose that a corporation is organized for 100 years. Would such an argument then have a basis? In this case it was organized for fifty years, the utmost limit permitted under our statute. If a young man of reasonable maturity, say of the age of 25, were to aid

in organizing such a corporation, the end of the period would take him to the grave or the edge of it, and it is hardly probable that he would consider the time limit as an essential part of the contract. The very fact that 50 years, the utmost limit under the statute, is chosen would seem to negative that fact. The court in the Colorado case cited further stated that "neither the state as a sovereignty, nor the citizens of the state have any interest whatever in the perpetuation of a corporation of the character of this defendant, nor can the perpetuation of such a corporation be deemed necessary from any point of view, either to promote the public interests or to prevent injury to the citizens of the state." We do not think that in determining the constitutionality of a statute such as involved in this case we should consider only a particular corporation, but must consider corporations in general. Doing so we are not satisfied that the statement last quoted is persuasive. Millions of shares of stock of corporations are purchased annually in the United States on the strength of the fact that the corporations are going concerns and will continue to be so. It would doubtless surprise the purchasers to learn that they must, in addition to other matters, make careful inquiry as to when the charter of the corporation, whose shares they purchase, will expire, and that they may face the fact that a dissenting stockholder may force its dissolution upon the expiration of the charter or articles of incorporation. We have, in this state, perhaps, few, if any, corporations the shares of which are bought to any great extent from time to time by citizens or residents of this state or of other states. But we are not entirely persuaded that this condition will be permanent. And in this very case Carlisle and Johnson invested considerable money on the strength of the belief that the legislature had the power to grant additional life to a

corporation. We are not, accordingly, convinced that the extension of corporate life is purely a private matter, and of no public concern, and that the legislature has no power to interfere with it. And we must remember that, to justify us in declaring a statute unconstitutional, it must be clear that it is so.

Quite a number of authorities which, while not directly in point, indicate the general thought of the courts that the extension of corporate life is not a fundamental or unreasonable change in the charter. Thus it is said that "a statute is not unconstitutional, as an impairment of the rights of minority stockholders, where it merely grants the corporation additional powers or privileges, or more adequate means of effectuating the corporate objects." 12 C. J. 1063; 16 C. J. S. 810. While the cases so holding mostly relate to the business undertaken by the corporation, the underlying principle would seem to apply to extension of corporate life, for it, too, merely involves an additional privilege to carry out the business enterprise undertaken by the corporation. In a note in 108 A. L. R. 62 are collected cases which have held statutes extending or enabling the extension of, corporate life to be constitutional. Perhaps none of them can be said to be directly in point, and most of them do not involve a contention of minority stockholders that the corporation's right to exist has expired. Nevertheless a number of them would seem to indicate a trend of thought that the extension of corporate life is not a fundamental or unreasonable change. An interesting case is Keetch v. Cordner, 90 Utah 423, 62 P. (2d) 273, 108 A. L. R. 52, in which it was claimed that the charter of a corporation had expired, but its life had been extended by amendment. At the time of the original organization, the laws of Utah provided that the charter might be amended by increasing or decreasing the capital stock, and that "the articles of agreement or

incorporation may be otherwise changed or amended, provided such an amendment does not alter the original purpose of the corporation." The court held that this general clause enabled the corporate life to be extended, and that such extension is constitutional though a minority of stockholders objected. It would seem that the clause is little, if any, broader or more specific than the provision of our legislative act of 1876 that "the legislature may at any time alter, amend or repeal this chapter," for this statement implies, as stated in the Utah case, "a right of stockholders of a corporation to amend its articles of agreement to conform to the law when amended." In State ex rel. v. Leader Company, 97 Mont. 586, 37 P. (2d) 561, the state, by quo warranto, challenged the legal existence of the Leader Company, a corporation organized in 1893. No statute then provided for the extension of corporate life, but a legislative act of 1931 made provision therefor, and the Leader Company had complied therewith. The court stated: "The power of the legislature to provide for the extension of the term of the one, or the revival of the other, is not, and cannot be questioned. Such power exists." In Black River Improvement Company v. Holway, 87 Wisc. 584, 59 N. W. 126, the court had occasion to interpret the term "alter" in connection with the reserved power of the state constitution, also contained in our law and constitution. Quoting from a previous case, it was held that this power should not be construed narrowly. It was said that to "alter is to make different, without destroying identity; to vary without entire change. A corporate charter of one kind cannot be altered to a charter of an entirely different kind. But a corporate charter may be altered so as to make it different in detail, so long as the general identity of the corporation remains; so that it is varied, without entire change." In Seneca Mining Co. v. Secretary of State,

82 Mich. 573, 47 N. W. 25, 9 L. R. A. 770, it appears that the corporation in question was organized in 1860. Thereafter a constitutional amendment and a statute were enacted enabling the extension of the corporate life. The court held that the extension was valid and directed the secretary of state to file the certificate under which such extension was sought. In Miner v. R. R. Co., 123 N. Y. 242, 25 N. E. 339, the court stated that "the legislature reserved the right to alter or modify the charter, and thus the life of the corporation could be extended."

In several cases, it is intimated or expressly stated that the period of existence of a corporation is, in the main, merely of concern to the state. If that is correct, then, of course, the extension of corporate life cannot be said to be a fundamental change in the charter or articles of incorporation. In People ex rel. v. Marshall, 6 Ill. 672, the court stated that "the extension of the charter (of a corporation) must * * * be clearly inhibited by some constitutional provision or the power to do so is possessed by the legislature." In Taggart ex rel. v. Perkins, 73 Mich. 303, 41 N. W. 426, 430, the court said that "the power to extend corporate existence beyond the time limited by charter, either before or after the limitation has expired, is possessed by the legislature as a prerogative of sovereignty, and is not conferred by constitutional provisions. If there is no denial expressly or by implication from other limitations placed upon legislative power contained in the constitution, the power exists and may be exercised at the pleasure of the law-making power." In Smith v. Eastwood Mfg. Co., 58 N. J. Eq. 331, 43 Atl. 567, the court stated: "The period of corporate existence is a matter which prima facie concerns the state only, and the limitation to a definite period is an exercise of control in the interest of the public. Stockholders may, perhaps, under the laws which authorize special re-

strictions in charters, exclude the power of continuing corporate existence beyond the period, but unless this power is excluded, the corporation may, as between itself and the stockholders, extend its corporate existence under the laws for that purpose which existed at the time of the incorporation, provided these laws still remain in force at the time of the proceedings for continuance, or under subsequent laws, by which the state, as it has a right to do, in its control over corporations, restricts rather than enlarges the power of continuing the existence." This quotation was approved in Wm. Warnock Co. v. Mfg. Co., 200 Minn. 196, 273 N. W. 710. In Stott v. Realty Co., 288 Mich. 35, 284 N. W. 35, it appears that the corporate charter had, under a law existing at the time of organization, become forfeited by reason of non-payment of fees. A law was passed thereafter enabling the reinstatement of the corporation. It was claimed that this law was unconstitutional; that when the charter was forfeited, the stockholders had a vested right in having the corporation dissolved. The law providing for forfeiture became part of the charter, as though it had read "It is hereby agreed that if the charter becomes forfeited under the laws of this state, this corporation shall thereupon be dissolved." When, accordingly, the law permitted the reinstatement, and the corporation was actually reinstated, there was a violation of the contractual right as to the period of existence, just as much so as in the case at bar. But the court held that the plaintiff could not complain, stating that the "legislature has the power by general law to provide for the renewal and revival of the existence of a corporation, after the charter of the corporation has become void." The only difference between that case and the case at bar is the fact that there the relationship of the state to the corporation and its stockholders is more accentuated than is true in this case.

That the extension of corporate life is not a fundamental change is further indicated by cases which have held that unanimous consent of the stockholders is not necessary for that purpose. That holding appears in Fletcher, supra, section 407; note 108 A. L. R. 72; Smith v. Eastwood Mfg. Co., supra; Keetch v. Cordner, supra; Loeffler v. Federal Supply Co., 187 Okl. 373, 102 P. (2d) 862. In the Utah case the court stated that "it is not contended that there is any legal objection to amending the articles of agreement of a corporation merely because all of the stockholders thereof do not consent thereto. If such claim were made, it could not be successfully maintained." In the Oklahoma case, the court was even more specific, stating that "generally, the renewal or extension of the corporate existence does not seem to be regarded as such a material or fundamental change in the purpose of the corporation as to require the unanimous vote of the stockholders." In Union Hotel Company v. Hersee, 79 N. Y. 454, it appears that the corporation there involved was incorporated by special act of the legislature. The charter provided that the hotel undertaken to be constructed should be completed within four years, or the charter should otherwise be void. Subsequently the legislature amended the charter by extending the time for completion to five years. Defendant was a subscriber to the stock of the corporation under its original charter, and he contended that his contractual relation was violated by the amended charter, and that his subscription was void. The court overruling the contention, referred to the law providing that the charter of a corporation may be altered or amended, and stated further: "The effect is the same as if this provision had been inserted in the plaintiff's charter. It is thus a part of the defendant's contract, and it is impossible to say that the alteration made by the amendment of 1873 was without his assent. Nor

is the change organic. It leaves the end and purpose of the corporation as it is declared in the statute of 1871. It simply enlarges the time for its execution." A similar case is Taggart v. R. R. Co., 24 Md. 563, 596, involving the amendment of the charter of a railroad corporation, extending the time for the completion of the road. The court stated: "It is not one of those fundamental radical changes, which diverts the funds from the original purpose to which they were dedicated, or is manifestly prejudicial to the stockholder, but comes within that class of cases in which the change was held to be auxilliary to the original object of the incorporation, and beneficial to the stockholders." In a similar case, namely Agricultural Branch Railroad Company v. Winchester, 13 Allen 29, 33, the court stated that "nothing is more common than alterations of railroad charters extending the time for completing the road, and such extensions do not fundamentally or very essentially change the character of the charter."

A review of these authorities would seem to indicate that an extension of the corporate life is just as in the New York case last cited, but an enlargement of the time for the execution of the enterprise undertaken by the corporation, and as such is not a fundamental change, but may be made, or rather permitted, under the reserved power of alteration or amendment contained in the constitution and statute of the state. The least that could be said is that it is not clear that the change is so fundamental that it should be declared in violation of the constitution relating to the impairment of the contract of the stockholders. The contention, then, that the enactment of the act of 1911 is unconstitutional as to the plaintiffs must be overruled.

■ Moreover, the minority stockholders, or at least some of them, including some of the plaintiffs, must be held to have assented and acquiesced in the exten-

sion of the life of the corporation on other grounds. Assent and acquiescence need not be express. It may be implied. 14 C. J. 186; 18 C. J. S. 476; Glover v. Meyer, 3 Ky. L. 181; Miller v. Ins. Co., 72 Tenn. 167, 184; Comm. v. Cullen, 13 Pa. St. 133; Cook, Corporations (8th ed.) Sec. 503. The notice of the annual meeting held in the spring of 1935 expressly stated that "resolutions will be offered regarding the renewal of the corporate franchise of this company, which expires on October 19, 1935." Such resolution was duly offered and passed without a dissenting vote. At least the stockholders who participated in that meeting would, it is held, be estopped from questioning the extension of the charter. 14 C. J. 181. Thereupon, in the fall of 1935, the directors filed the requisite certificate for the extension. At the annual meeting in the spring of 1936 resolutions were duly adopted, without dissent, approving of all the acts of the directors during the preceding year. The plaintiff Wicks was present and acted as secretary. He also was present at the annual meeting held in the spring of 1937, and acted as secretary. The plaintiff Harrison was present at the annual meeting held in the spring of 1939 and seconded the nominations for directors of the persons who were elected at that time. It has been held that "when a corporation proceeds to act under a statute, good faith to the company, as well as to those dealing with it, requires a non-assenting stockholder should make known his non-acceptance of its action in an unequivocal and public manner." Detroit Trust Co. v. Allinger, 271 Mich. 600, 261 N. W. 90, 95. These acts of plaintiffs Wicks and Harrison were inconsistent with non-assent. They are consistent only with assent to the fact that the corporation was then a going concern. Mrs. Quinn, a minority stockholder, holding nearly 700 shares of the corporation, and one of the minority stockholders, participated in the annual meet-

ing held in 1938 and 1939, and participated in the election of a director or directors. Some of the minority stockholders—the record is not clear just who—knew of the dealings with Moyle and with Carlisle, and were perfectly willing that they should buy the stock of the Chicago stockholders and expend thousands of dollars in doing so. They permitted Carlisle to complete his purchase, and made no objection whatever as to the existence of the corporation here in question, until he declined to buy their shares in the spring of 1939, four years after the annual meeting which had authorized the extension of the life of the corporation. The corporation continued, not only to hold its regular annual meetings, after due notice was given, but also to do all its business as such after the certificate of the extension of the corporate life had been filed, just as before, and no one objected till this suit was brought in the spring of 1939. We are unable to see that there would be any justice in now holding that the extension of the life of the corporation should be held to be invalid. The record does not disclose any specific assent of the plaintiff Drew or any knowledge of the dealings with Moyle and with Carlisle. It has been held that the assent of a stockholder will be presumed unless he affirmatively prove his dissent from the action of the corporation. Martin v. Railroad Company, 8 Fla. 370, 73 Am. Dec. 713; Detroit Trust Co. v. Allinger, 271 Mich. 600, 613. The record fails to disclose any dissent on her part, unless it be that the institution of this suit, four years after the corporate extension was authorized, is sufficient. We need not decide that point. But she is a plaintiff jointly with two who must be held to have given their assent, and must abide by the result proper as to them.

■ The court declined to find that there was any mismanagement of the affairs of the corporation, so as to authorize the appointment of a receiver. We do

not think that we are justified in finding otherwise. The main point relied on is the fact that Henry D. Moyle received a lease for the property of the corporation, at a rental of $4000 per annum, at the time when his option-agreement for the purchase of the stock of the Chicago stockholders was made, and counsel for appellants, accordingly, argue that the Chicago stockholders used the corporate property for the purpose of enabling them to sell their stock. The record herein, however, indicates that Moyle refused to enter into the lease, unless he at the same time received an option to purchase the stock. In other words, the interests of the corporation were advanced by the option to purchase the stock.

We find no prejudicial error in the record, and the judgment of the trial court is, accordingly, affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.

### ON PETITION FOR REHEARING

BLUME, Justice.

A petition for a rehearing has been filed herein. We have read over the brief in support thereof with care. Counsel re-argues that the clause in the legislative act of 1911 reading "any corporation organized under any law of this state" does not include corporations organized in territorial days, and he insists that we have not given the words their ordinary meaning. But as pointed out in the original opinion, the laws of the territory, including the laws under which the corporation here in question was organized, were by specific constitutional provision made a part of the laws of the state. We are unable to see how we can ignore this plain provision, and how, in view thereof, we could in fairness, and without resorting to technical construction, say that the corporation here in question

was not organized under a law of this state. If we should so hold we should not, we think, give the words of the statute their ordinary meaning. Counsel mentions in this connection the fact that the bill for the 1911 act, Senate File 33, "was introduced and sponsored by the justice who wrote the opinion now under discussion, then a member of the state senate, which suggests some question of the propriety of his so doing." The point is new. The writer hereof was unaware of any impropriety in writing the opinion, and unaware that he was less qualified to construe the legislative act above mentioned by reason of the fact that he sponsored it in the state senate. It is generally thought that thorough knowledge of the history of legislation—and sponsoring an act could only involve such knowledge—is an aid in the construction thereof, rather than a disqualification. Some of our predecessors, namely, Justices Knight, Conaway, Scott, and Potter, were members of the constitutional convention. They, particularly the last named, were frequently called upon to construe provisions of the constitution, yet it has never been suggested, so far as we know, that they were disqualified to do so, or that it was improper for them to write an opinion in that connection. If participation in the legislation disqualifies a man to construe it judicially, then the president of the United States commits an act of impropriety every time that a member of the Senate of the United States is appointed to a seat on the Federal bench, including the highest bench in the land, and that would be particularly true in the case of a man who has long served in the Senate, for such appointees are doubtless frequently called upon to interpret statutes in the making of which they participated. Of course, counsel is much too complimentary to the writer hereof in thinking that he, after the expiration of thirty years, would remember, either the intention of the legislature or his

own, in connection with the phrase "organized under any law of this state," used in the legislative act of 1911. Reference to the writer's connection with that act was probably made by reason of the disappointment of counsel in the result of the case. And such disappointment is natural. Yet the members of the bar well know that the lot of lawyers is, unfortunately, in the nature of things, one of frequent disappointment. But in that connection they should remember that it gives no pleasure to the court to be the cause thereof. An opinion in cold type may seem to come from a bloodless heart, when in fact it found birth only after much travail.

Counsel re-argues that the right to have the corporation dissolved after fifty years is a contractual right of which plaintiffs could not be deprived. The brief does not shed any new light on the subject. We made an exhaustive investigation of the point, and found that the thought of the courts has been nearly unanimous that under statutory and constitutional provisions similar to ours, the extension of corporate life is not, ordinarily, a fundamental change. Counsel evidently overlooked our statement in the original opinion, supported by authority, that "it is not a valid argument that the contract herein was changed." The power of the state, reserved in our statute and constitution, to alter and amend the laws governing corporations is, on its face, plenary, enabling the legislature to change them in any and every respect without impairing any contractual right. If that can not be done in a particular respect, it is an exception to the rule. Counsel has evidently not appreciated that fact. Courts have made exceptions. They have protected vested property rights. They have held that the change must not be unreasonable. Is a law enabling the extension of corporate life unreasonable as to a dissenter? We have seen that the authorities have answered in

the negative. We also find a negative answer when we consider the history of corporations. Originally, it seems, all corporations existed for an unlimited time. In Roman law, it seems, the corporation continued to exist whether "all of its members remain, whether only part of them remain, or whether all of them have been changed." D. 3, 4, 7, 2. In the middle ages the idea prevailed that if all the members of a private corporation disappeared, the corporation came to an end. 9 Holdsworth, History of English Law, 62. That view was adopted by Blackstone. 1 Comm. 485. Thomas Cooley, his annotator, states that "this result would not follow where the corporators had interests represented by shares, which would pass on their death to their personal representatives." And Holdsworth, supra, states that the statement of Blackstone is "by no means a self-evident rule, and it was not the rule of Roman law." However that may be, aside from the instance mentioned, all corporations seem to have had a continued existence. Elliott on Private Corporations (4th ed.) Sec. 142, states that "it is said to be of the very essence of a common law corporation that it have perpetual succession." Blackstone, 1 Comm. 475, states that "after a corporation is so formed * * * and named, it acquires many powers, rights, capacities. * * * Some of these are necessarily and inseparably incident to every corporation, * * * as first, to have perpetual succession." Thompson on Corporations (3rd ed.) Section 8, tells us that "it was chiefly for the purpose of clothing the bodies of men in succession with the quality of immortality and individuality that corporations originated and are still perpetuated * * * Indeed the essential idea of a corporation is perpetual succession." See also, Trustees of Dartmouth College v. Woodward, 4 Wheat. 578, 636. It is clear then that under common law theory extension of corporate life was consistent with the nature of the organization,

and hence could not be considered a fundamental or unreasonable change. Elliott, supra, explains how the former idea came to be modified, stating that "after the decision in the Dartmouth College case, it became the practice to limit the life of a corporation to a certain period in order that the state might retain proper control over it." That is corroborated by Morawitz on Private Corporations (2nd ed.) Sec. 418, where he states that provisions limiting the life of corporations "are usually inserted for the benefit of the state"—a thought expressed by some of the authorities cited in our original opinion. Since the time when such limitation was first made, and particularly in the last century, a tremendous growth and development of corporations has taken place. That indicates a general thought and agreement that corporations are a necessity in the industrial and economic development of our nation. It is not a far step from that thought to the return of the thought of at least partial perpetuity, and hence that extension of corporate life is a natural step and not a fundamental and unreasonable change. It cannot, accordingly, be surprising that state after state has adopted legislation to that end. But it is plain that that has resulted merely in the restoration, in part, of an element considered at common law inherent in the nature of corporations, namely, that of perpetual succession, and to give back to them, under certain conditions, a right or capacity which they formerly possessed. The contention of counsel, accordingly, has been shown not to be well taken both by history as well as by authority.

And looking at the situation from an independent and broad standpoint, we are unable to say that the courts have reached the wrong conclusion. Rules of law cannot be made to conform to every individual's conception of what is just and right, even though not without merit. Differences of opinion are apt to arise,

since interests are apt to clash. And they are apt to clash when majorities and minorities are involved. It may be that the legislature might be able to make a more ideal law than we have on our statute books. But it must, at best, be difficult to make a law which is ideally just under all circumstances. When courts are confronted by a situation such as that before us, all they can do, and must do, is to measure and balance the various interests, and, in the absence of specific legislation, and when no inherently unmoral action is involved, protect all of them, as nearly as possible, in due proportion. Minority interests must, in the case of corporations, be necessarily subordinated to majority interests in many respects. As we pointed out in the original opinion, the extension of corporate life may at times be detrimental to shareholders—taking them as a whole—but we doubt that that can be said to be true as a rule, and that is the reason why courts have taken the view above mentioned. That is not to say that the holders of a majority or two thirds of any other proportion of the stock have the right to act oppressively. Rules of law regulate that, and under proper circumstances a single stockholder with a single share of stock can bring his oppressors to account. In this manner courts have attempted to harmonize the interests of stockholders as a whole, and though the result may not be ideally just under all circumstances, it is at least an approximation thereto.

Exception is taken to our statement in the original opinion that at least some of the minority stockholders permitted Carlisle to complete his purchase, and did not raise any objection to the continued existence of the corporation until after that time. Counsel contend that Mr. Spaulding raised the point that the corporate life had expired on April 3, 1939, and that on that date Carlisle had not *completed* his purchase of the majority of the stock, for the reason that he testified that he

made his contract on April 4, 1939. Counsel lay too much stress upon the exact date. Whatever was done on April 4, negotiations had been carried on long previously. Carlisle specifically testified that he had completed his purchase on April 3, 1939. On that date, the stock purchased and the first payment due therefor were in a bank in Chicago, and counsel have not suggested how Carlisle could have rescinded the transaction at that time. We think that our statement was substantially correct.

In the trial below plaintiffs contended that the affairs of the corporation had been mismanaged, and among other things claimed that a lease on the corporate property was given to Moyle in order to induce him to buy the stock of the Chicago stockholders—presumably claiming that the rental for the property should have been greater. The trial court found against plaintiffs, and we held that we could not reverse such holding, stating in substance that the record indicates that the lease was not made as an inducement such as claimed. Exception is taken to such statement, and it is asserted that there is nothing in the record to justify it. The lease is dated May 1, 1938, and recites that "it is *expected* that a formal option will be given" for the stock. On June 13, 1938, the corporation and Moyle entered into an agreement, and therein, among other things, Moyle agreed to buy all the stock of the corporation, if offered, at $14.00 per share, and the agreement recites that it is given for the purpose of inducing Moyle to enter into the lease-agreement. The witness Judson denied specifically that the lease was made as an inducement such as is claimed. He testified that the lease would have been made whether an option to purchase stock had been granted or not; that the reason for leasing the land was because the operations of the corporate affairs had previously resulted in a loss. We

would not, under such testimony, be justified in reversing the trial court's finding on this point.

We find no reason for a rehearing, and it is, accordingly, denied.

*Rehearing denied.*

RINER, Ch. J., and KIMBALL, J., concur.