## UNITED STATES *v.* SPECTOR.

No. 443.   Argued March 6, 1952.—Decided April 7, 1952.

*Robert L. Stern* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Beatrice Rosenberg* and *Kenneth C. Shelver.*

*John W. Porter* and *A. L. Wirin* argued the cause and filed a brief for appellee.

Mr. Justice Douglas delivered the opinion of the Court.

Section 20 of the Immigration Act of 1917, as amended, 39 Stat. 890, 57 Stat. 553, 64 Stat. 1010, 8 U. S. C. (Supp. IV) § 156, contains provisions designed to expedite the deportation of aliens. Section 20 (a) provides that the Attorney General shall direct the deportation "to the country specified by the alien, if it is willing to accept him into its territory." Otherwise the Attorney General shall direct the deportation to any one of a series of specified countries or if deportation to any of them is impracticable, inadvisable, or impossible, then to any country which is willing to accept the alien. Section 20 (b) grants the Attorney General powers of supervision over aliens against whom deportation orders have been outstanding for more than six months and fixes penalties for violations of the regulations which the Attorney General has prescribed. Section 20 (c) provides that any alien against whom a specified order of deportation is outstanding "who shall willfully fail or refuse to depart from the United States within a period of six months from the date of such order of deportation, or from the date of the enactment of the Subversive Activities Control Act of 1950, whichever is the later, or *shall willfully fail or refuse to make timely application in good faith for travel or other documents necessary to his departure, . . . .* shall upon conviction be guilty of a felony, and shall be imprisoned not more than ten years . . . ." (Italics added.)

The latter (the italicized) provision of § 20 (c) is involved here. Appellee is an alien who came to this country from Russia in 1913. An order of deportation was entered against him in 1930 by reason of his advocacy of the overthrow of the Government by force and violence. An indictment was returned against him, two counts of which charged him with willfully failing and refusing to

make timely application in good faith for travel or other documents necessary to his departure from the United States. The District Court sustained a motion to dismiss these two counts. It held that the statute in question was unconstitutionally vague and indefinite, because it did not specify the nature of the travel documents necessary for departure nor indicate to which country or to how many countries the alien should make application. 99 F. Supp. 778. The case is here on appeal. 18 U. S. C. (Supp. IV) § 3731.

While a statute, plain and unambiguous on its face, may be given an application that violates due process of law, we are not concerned with that problem in the present case. The question here is whether the statute on its face meets the constitutional test of certainty and definiteness. We think it does when viewed in its statutory setting.

The statutory scheme seems clear and unambiguous. The choice of a country willing to receive the alien is left first to the alien himself and then to the Attorney General. Once the country willing to receive the alien is identified, the mechanism for effecting his departure remains. The six-month period specified in § 20 (c) makes clear what a "timely" application is. The statutory words "travel or other documents necessary to his departure" will, of course, have different meanings in reference to various countries. The forms to be filled out, the deposits to be made, the number of photographs to be furnished, and the information to be supplied will vary from country to country. But when the country to which the alien is to be deported is known, any mystery concerning the documents necessary to his departure vanishes. The words "necessary to his departure" when applied to deportations would normally refer to a lawful departure from this

country and a lawful entrance into another. The alien satisfies the statute by making timely application for such documents as the country in question requires for his admission.

The statute might well be a trap if, for example, it required the alien to know the visa requirements of one or more countries. But the emphasis of the present statute is on a "timely application in good faith" for such documents as the country in question may require. Though the visa requirements for entrance into a particular country are in constant change, the command of the statute remains simple and intelligible. We conclude that the warning contained in the statute is sufficiently definite to free it of any constitutional infirmity of vagueness. Cf. *United States* v. *Petrillo,* 332 U. S. 1; *Jordan* v. *De George,* 341 U. S. 223.

Another question of constitutional law is pressed upon us. It is that the statute must be declared unconstitutional because it affords a defendant no opportunity to have the court which tries him pass on the validity of the order of deportation. That question was neither raised by the appellee nor briefed nor argued here. If it had been, we might consider it. See *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 330. But when a single, naked question of constitutionality is presented, we do not search for new and different constitutional questions. Rather we refrain from passing on the constitutionality of a phase of a statute until a stage has been reached where the decision of the precise constitutional issue is necessary. See *United States* v. *Petrillo, supra.*

It will be time to consider whether the validity of the order of deportation may be tried in the criminal trial either by the court or by the jury (cf. *Yakus* v. *United*

*States,* 321 U. S. 414; *Cox* v. *United States,* 332 U. S. 442) when and if the appellee seeks to have it tried. That question is not foreclosed by this opinion. We reserve decision on it.

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

The only thing certain about § 20 (c) of the Immigration Act of 1917, as amended, is that violation of its terms is a felony punishable by ten years' imprisonment. An alien ordered deported by the Bureau of Immigration is subject to this ten-year penalty if he "willfully fail or refuse to make timely application in good faith for travel or other documents necessary to his departure." To avoid punishment an alien must guess with unerring accuracy what answers a judge or jury [1] might someday give to the following questions: (1) When is an application "timely"? (2) What constitutes a "good faith" application? (3) What kind of "documents" are "necessary to his departure"? (4) To *whom* must he apply for these documents?

Aliens living in this country are not necessarily sophisticated world travelers familiar with the present-day red

---

[1] "In earlier times, some Rulers placed their criminal laws where the common man could not see them, in order that he might be entrapped into their violation. Others imposed standards of conduct impossible of achievement to the end that those obnoxious to the ruling powers might be convicted under the forms of law. No one of them ever provided a more certain entrapment, than a statute which prescribes a penitentiary punishment for nothing more than a layman's failure to prophesy what a judge or jury will do. . . ." *Williams* v. *North Carolina,* 325 U. S. 226, 278 (dissenting opinion). Cf. *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 89.

tape that must be unwound to get from one country to another. Congress should at least indicate when, to whom, and for what the alien should apply. If, for example, the statute merely required an alien to report at a certain time and place to sign "documents" collected by the American Department of State, the affirmative conduct demanded would at least be clear and specific. But the present statute, in my judgment, entangles aliens in a snare of vagueness from which few can escape. I think the Constitution requires more than a "bad" guess to make a criminal.[2]

Mr. Justice Jackson, with whom Mr. Justice Frankfurter joins, dissenting.

I think this Act to punish an alien's unlawful presence in the United States is unconstitutional for reasons apparent on its face.[1] It differs in subtlety but not in substance from one held unconstitutional more than half a century ago in a decision repeatedly and recently cited with approval. *Wong Wing* v. *United States*, 163 U. S.

---

[2] My belief that the statute is void for vagueness makes it unnecessary for me to reach the constitutional question discussed by Mr. Justice Jackson, although I have not yet seen a satisfactory reason for rejecting his view. See my opinion in *Maggio* v. *Zeitz*, 333 U. S. 56, 78–81.

[1] The pertinent portion of § 20 (c) of the Immigration Act of 1917 (as rewritten in § 23 of the Internal Security Act of 1950, 64 Stat. 1010, 8 U. S. C. (Supp. IV) § 156 (c)) reads as follows:

"Any alien against whom an order of deportation is outstanding under [various named statutes] . . . who shall willfully fail or refuse to depart from the United States within a period of six months from the date of such order of deportation, or from September 23, 1950, whichever is the later, or shall willfully fail or refuse to make timely application in good faith for travel or other documents necessary to his departure . . . shall upon conviction be guilty of a felony, and shall be imprisoned not more than ten years . . . ."

228.[2]   The Act there stricken down was simple and direct. It provided that any Chinese person or person of Chinese descent adjudged by any justice, judge or commissioner of the United States not lawfully entitled to be or to remain in the United States should first be imprisoned at hard labor and thereafter removed from the United States.   The Court conceded that it would be competent for Congress to declare that an alien remaining unlawfully in the United States could be criminally punished "if such offence were to be established by a judicial trial." 163 U. S. at 235.   However, it said:

"But when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused.

"No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein.   But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial.   It is not consistent with the theory of our government that the legislature should, after having defined an offence as an in-

---

[2] *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 586; *Li Sing* v. *United States*, 180 U. S. 486, 495; *Downes* v. *Bidwell*, 182 U. S. 244, 283; *Russian Volunteer Fleet* v. *United States*, 282 U. S. 481, 489.

famous crime, find the fact of guilt and adjudge the punishment by one of its own agents." 163 U. S. at 237.[3]

Thus the Court held that the Constitution prohibited *for criminal purposes* a judicial determination without a jury that the alien was illegally present in the United States. It held that the facts which made his presence illegal must be established to the satisfaction of a jury, although the actual case before it seems to have presented

---

[3] In *Li Sing* v. *United States, supra,* at 494–495, the Court quoted *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730, as follows:

"[An] order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority, and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty or property, without due process of law; and the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application."

The *Li Sing* Court then went on, however, to say that:

"It may be proper here to mention that this court has held that, while the United States can forbid aliens from coming within their borders, and expel them from the country, and can devolve the power and duty of identifying and arresting such persons upon executive or subordinate officials, yet, when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused. *Wong Wing* v. *United States,* 163 U. S. 228."

That Court thereby made it clear that there is a great distinction between deportation itself and a deportation order that may be made the basis of subsequent criminal punishment. It is that distinction which we press for here. See Fraenkel, Can the Administrative Process Evade the Sixth Amendment? 1 Syracuse L. Rev. 173.

only the narrowest and simplest issues, namely, whether the alien was a Chinaman and whether he was here. If so, his entry and his presence at any time were illegal. In contrast, this Act incriminates those whose presence here is entirely legal but for guilt of some forbidden conduct since entry. Certainly illegal presence under present laws involves a much more trialworthy issue than in *Wong Wing's* case.

This Act creates a crime also based on unlawful residence in the United States. The crime consists of two elements: one, an outstanding order for deportation of an alien; the other, the alien's willful failure to leave the country or take specified steps toward departure. The Act does not permit the court which tries him for this crime to pass on the illegality of his presence. Production of an outstanding administrative order for his deportation becomes conclusive evidence of his unlawful presence and a consequent duty to take himself out of the country, and no inquiry into the correctness or validity of the order is permitted.

The subtlety of the present Act consists of severing the issue of unlawful presence for administrative determination which then becomes conclusive upon the criminal trial court. We must not forget that, while the alien is not constitutionally protected against deportation by administrative process, he stands on an equal constitutional footing with the citizen when he is charged with crime.[4] If Congress can subdivide a charge against an alien and avoid jury trial by submitting the vital and controversial part of it to administrative decision, it can do so in the prosecution of a citizen. And if vital elements of a crime can be established in the manner here attempted, the way would be open to effective subversion

---

[4] *Harisiades* v. *Shaughnessy, supra,* at 586.

of what we have thought to be one of the most effective constitutional safeguards of all men's freedom.

Administrative determinations of liability to deportation have been sustained as constitutional only by considering them to be exclusively civil in nature, with no criminal consequences or connotations. That doctrine, early adopted against sharp dissent has been adhered to with increasing logical difficulty as new causes for deportation, based not on illegal entry but on conduct after admittance, have been added, and the period within which deportation proceedings may be instituted has been extended.[5] By this Act a deportation order is made to carry potential criminal consequences.

If the administrative adjudication that one is liable to deportation and the resulting orders are not exhausted when they have served as warrant for the authorities to eject the alien but become conclusive adjudications of his unlawful presence for the purpose of his criminal prosecution, quite different principles come into play.

The adjudication that an alien has been guilty of conduct subjecting him to deportation is not made by procedures constitutional for judgment of crime. It is not made either by a jury trial or a court decision. All that is required by statute is a hearing before an administrative officer and that may be before one who acts both as the alien's judge and prosecutor.[6] The finding that the alien is guilty of conduct subjecting him to deportation does not require proof beyond reasonable doubt but may be made on mere preponderance of evidence. If the deter-

---

[5] *Harisiades* v. *Shaughnessy, supra,* at 587.

[6] *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, holding that the Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. § 1001 *et seq.,* required separation of judging and prosecuting functions, was subsequently set aside by Congress which specifically exempted deportation proceedings from 5 U. S. C. §§ 1004, 1006, and 1007. 64 Stat. 1048, 8 U. S. C. (Supp. IV) § 155a.

mination of deportability is subject to review under § 10 of the Administrative Procedure Act, 60 Stat. 243, 5 U. S. C. § 1009, a question expressly reserved in *McGrath* v. *Kristensen,* 340 U. S. 162, 169, and not decided here, any evidentiary attack raises only the question whether on the record as a whole there is substantial evidence in support of the order. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474. No statute of limitations applies in some cases and the offense which renders the alien deportable may have occurred, but ceased, many years ago,[7] while under statutes applicable to crimes, the same act, if a crime, long would have ceased to be subject to prosecution.

Having thus dispensed with important constitutional safeguards in obtaining an administrative adjudication that the alien is guilty of conduct making him deportable on the ground it is only a civil proceeding, the Government seeks to turn around and use the result as a conclusive determination of that fact in a criminal proceeding. We think it cannot make that use of such an order.

It must be remembered that the deportation proceeding is an exercise of adjudicative, not rule-making, power. The issue on which evidence is heard is whether the alien has committed acts which are grounds for deportation. The decision is whether he is guilty of such past conduct, and, if so, the legal result is liability to deportation. This is not the type of administrative proceeding which results in a rule or order prescribing rates or otherwise guiding future conduct.

Experience in the Executive Department with the immigration laws made me aware of a serious weakness in the deportation program which Congress by this Act was trying to overcome. A deportation policy can be successful only to the extent that some other state is will-

---

[7] *Harisiades* v. *Shaughnessy, supra.*

ing to receive those we expel. But, except selected individuals who can do us more harm abroad than here, what Communist power will cooperate with our deportation policy by receiving our expelled Communist aliens? And what non-Communist power feels such confidence in its own domestic security that it can risk taking in persons this stable and powerful Republic finds dangerous to its security? World conditions seem to frustrate the policy of deportation of subversives. Once they gain admission here, they are our problem and one that cannot be shipped off to some other part of the world.

While we would not join in a strained construction of the Constitution to create captious or trivial obstacles or delays to solution of this problem, we cannot sanction sending aliens to prison except upon compliance with constitutional procedures. We can afford no liberties with liberty itself.

The Court intimates that it might be compelled to agree with this constitutional objection to the statute were the reasoning advanced by counsel. I abstain from comment on this new squeamishness whereby the Court imprisons itself within counsel's argument. Cf. *Terminiello* v. *Chicago,* 337 U. S. 1. It is our duty before reversing a judgment to examine any ground upon which it can be sustained, even a ground which the court below may have overlooked or expressly rejected. See *Langnes* v. *Green,* 282 U. S. 531, and *Watts, Watts & Co.* v. *Unione Austriaca,* 248 U. S. 9, 21. But this Court is reversing the lower court which held this statute unconstitutional and is sending the Act forth limping with a potential infirmity, because the Court has become too shy to take up a point not sponsored by counsel, though, if well taken, it would support the judgment here being overturned. The least that could be done would be to order the case reargued.