**Thomas O. DuVALL, Lucille C. DuVall, and Ben C. Birdsall, Plaintiffs,**

**v.**

**G. E. MOORE, James E. Scherrman, G. E. Moore and James E. Scherrman, as Trustees of Midwest Employees' Profit Sharing Trust, Midwest Limestone Co., Incorporated, Defendants.**

**Civ. No. 66-C-2047-C.**

United States District Court
N. D. Iowa,
Central Division.

Aug. 30, 1967.

---

See also D.C., 276 F.Supp. 689.

Lloyd Karr, Webster City, Iowa, for plaintiffs.

A. Arthur Davis, Donald A. Wine and Donald J. Brown, Des Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, District Judge.

This ruling is predicated upon a motion by the defendants for summary judgment.

Jurisdiction of the instant case is grounded upon diversity of citizenship.

The complaint was filed by certain minority shareholders in relation to a purported amendment to the Articles of Incorporation of Midwest Limestone Co., Incorporated, hereinafter called Midwest, which sought to give the corporation perpetual existence.

Plaintiffs have filed what is denominated as a "Request for Findings of Fact and Conclusions of Law." It should be noted that Rule 56 of the Federal Rules of Civil Procedure limits any findings to material facts upon which there is no genuine issue if the case is fully adjudicated upon the motion and to ascertainment of "what material facts exist without substantial controversy" if the case is not fully disposed of.

Certain facts are without dispute. Defendant Midwest filed its Articles of Incorporation and was issued its license by the State of Iowa on February 2, 1953. The Articles provided that the life of the Corporation was twenty years which meant it would end on or about February 2, 1973. Pursuant to the Articles, two types of common stock, Class A and Class B, were issued by Midwest. The two types of capital stock were allocated as follows:

| | Class A | Class B |
|---|---|---|
| Thomas A. DuVall | 200 | 200 |
| Ben C. Birdsall | 34 | 500 |
| G. E. Moore | 219 | 2,000 |
| James E. Scherrman | | 50 |
| Midwest Employees' Profit Sharing Trust | 471 | 380 |
| Harry Anderson | | 250 |
| Eugene Simpson | | 180 |
| John A. Cloos | 76 | 500 |
| Total | 1,000 | 4,060 |

The defendants, G. E. Moore and James E. Scherrman, individually and as Trustees of the Midwest Employees' Profit Sharing Trust, were the owners of 690 shares of Class A stock and 2,430 shares of Class B stock. These amounts constituted a majority of both classes of stock. The plaintiffs and the other stockholders own a minority of the stock in interest.

On or about November 28, 1966, the defendants G. E. Moore, as President, and James E. Scherrman, as Secretary, caused a "Notice of Annual Meeting of Stockholders" to be sent to all the shareholders of Midwest. The Notice contained a proposal that the Articles be amended to provide for the perpetual existence of the Corporation. The annual meeting was held on December 8, 1966, at the home office of Midwest in Gilmore City, Iowa. A written objection to the perpetual duration proposal in the form of a "Notice of Dissent" was filed with the President and Secretary of Midwest. It was signed by Thomas O. DuVall, Lucille C. DuVall, and Ben C. Birdsall, Plaintiffs, and John A. Cloos. Birdsall and Cloos were personally present at the meeting. Birdsall filed a proxy at the beginning of the meeting which gave him authority to vote all of DuVall's stock, Class A and Class B. The Chairman of the meeting ruled that the Class B stock could not vote. Plaintiffs and John A. Cloos objected to the ruling and stated that it was their position that the Class B stock was entitled to vote on the proposed renewal. The objection was overruled by defendant Moore, the Chairman. Moore then called for a vote on the resolution, announcing that only Class A stock was entitled to vote. Plaintiffs and Cloos again objected and filed a document purporting to show their vote if they had been permitted to vote. The minutes show that the resolution passed by a vote of 690 to 310.

The complaint consists of two Counts. In Count I of the complaint, plaintiffs appear to be asserting a number of theories. In Paragraph 18, plaintiffs allege that the amendment to secure perpetual existence was in bad faith and for the purpose of depriving them of their property rights. In Paragraph 26 of the complaint, it is alleged that the plaintiffs and defendants are unable to agree as to the value of the stock owned by plaintiffs and the obligations of defendants in relation thereto. Plaintiffs claim that the defendants are obligated to purchase all their stock and that of John A. Cloos

under Iowa Code Section 491.25. Finally, plaintiffs allege that Section 491.25 is unconstitutional if it is construed to exclude the Class B stock owned by plaintiffs.

Plaintiffs pray, *inter alia*, for a declaration that defendants are obligated to purchase all of plaintiffs' stock, Class A and Class B, and for the Court to determine the real value thereof. In addition, plaintiffs seek recovery "for the costs of this action and for such other, further and different relief as to the Court may seem just and equitable in the premises."

Count II relates to an alleged agreement that both Class A and Class B stock were to vote on the proposed resolution to renew the Corporation.

The major issues which have been framed for the Court's consideration by the Motion for Summary Judgment and the briefs of the parties are: (1) Whether plaintiffs can have any recovery in the cause as pleaded; (2) Whether the Class B stock was entitled to vote upon the resolution to amend the Articles of Midwest to provide for perpetual existence; (3) Whether Iowa Code Section 491.25 is unconstitutional; (4) Whether the complaint is sufficient in its allegations of bad faith on the part of defendants; and (5) Whether Count II, relating to the voting agreement, can withstand the Motion for Summary Judgment.

As to the first issue presented for the Court's determination, the defendants contend that the plaintiffs have sought only a declaration that defendants are obligated to purchase all of the plaintiffs' stock and that they are not entitled to such relief regardless of whether or not the Class B stock was entitled to vote. The argument runs as follows: If the Class B stock was entitled to vote and if the Court were to deem that such stock was voted against the renewal, the resolution would have failed to pass by a vote of 1510 to 690; on the other hand, if the Court were to determine that the Class B stock was entitled to vote and the votes were not cast against the extension, there would similarly be no ob-

ligation of defendants to purchase plaintiffs' stock as Section 491.25 applies only to "stock voted against such renewal."

The premise from which defendants' argument flows is fallacious. Plaintiffs pray not only for appraisal but also general equitable relief. A prayer for general equitable relief must be liberally construed. Alcorn v. Linke, 257 Iowa 630, 133 N.W.2d 89 (1965). An equity court will grant relief under such a prayer when it is raised by the issues and supported by the evidence apart from other relief requested. Baldwin v. Equitable Life Assurance Society, 252 Iowa 639, 108 N.W.2d 66 (1961); 27 Am.Jur. 2d 813.

Plaintiffs suggest that the following forms of equitable relief would be appropriate in the case at hand:

1. A declaration that the resolution was not legally adopted and that the corporate life of Midwest has not been renewed to exist perpetually.

2. An order directing the defendants to convene a new meeting of the stockholders of the corporation to present the proposition and to give all stockholders the right to dissent therefrom or to vote thereon with a resulting obligation to purchase imposed on those voting for renewal if the resolution is adopted.

3. A decree restoring all parties to a status quo and holding that all stock of the corporation is entitled to dissent from or vote upon any future proposal for an extension of the corporate life.

Numbers 1 and 3 of the forms of relief to which plaintiffs feel they may be entitled seem to properly be directed at injunctive relief. Number 2 cannot be sustained as it appeals to the Court to direct defendants to convene a new meeting. Such a decree would be in the nature of mandamus. The Court cannot so order under Count I as defendants are not public officials.

In Berger v. Amana Society, 250 Iowa 1060, 95 N.W.2d 909, 70 A.L.R.2d 830 (1959), it was held that an action for an injunction against the corporation and officers to prevent certain illegal amendments to its Articles from being put into effect would lie. Quo warranto was adjudged to be an inappropriate remedy as the public interest was not involved. Also, the remedy was not certiorari against the Secretary of State who approved the disputed amendments because "he does not pass upon such matters as are involved in the present action. Presumably he has no knowledge of many of the points raised here." Id., 95 N.W. 2d at p. 916.

In Rath v. Rath Packing Co., 257 Iowa 1277, 136 N.W.2d 410 (1965), the Court struck down a purchase of the assets of Needham Packing Company by Rath. The transaction was in substance a *de facto* merger and a statutory merger section which required approval by two-thirds vote of the outstanding shares had not been met by Rath. The Court treated the plan as void and did not reach the issue of fairness. See also McDonough, The Appraisal Remedy for Dissenting Shareholders in Iowa and the De Facto Merger Doctrine: Rath v. Rath Packing Company, 16 Drake L.Rev. 22 (1966). Professor McDonough is of the opinion that the Court felt that any plan accomplished by other than the prescribed statutory procedure was unfair. The plan was enjoined until the necessary two-thirds vote was obtained and then the dissenters were to be entitled to appraisal.

It would appear that the holdings of the Supreme Court of Iowa are consistent with the general rule that a fundamental amendment to the Charter is ineffective if there has not been compliance with statutory standards. See 18 Am.Jur.2d, Corporations, Section 105. This would particularly be true if voting rights are wrongfully denied in contravention of statutes.

Deprivation of a stockholder's right to vote takes away an essential attribute of his property. See Fein v. Lanston Monotype Mach. Co., 196 Va. 753, 85 S.E.2d 353 (1955); Lawrence v. I. N. Parlier Estate Co., 15 Cal.2d 220, 100 P.2d 765; Brown v. McLanahan, 148 F.2d 703, 159 A.L.R. 1058 (4th

Cir.); In re Giant Portland Cement Co., 26 Del.Ch. 32, 21 A.2d 697; Outwater v. Public Service Corp., 103 N.J.Eq. 461, 143 A. 729; Lord v. Equitable Life Assurance Society, 194 N.Y. 212, 87 N.E. 443, 22 L.R.A.,N.S., 420.

■ It would seem that for the sake of clarity and to avoid confusion, the Court should first determine whether or not plaintiffs are entitled to an injunction against the operation of the amendment providing for renewal. Injunction is the only remedy if defendants have transgressed Section 491.25 by their action in disallowing Class B stock votes on the proposal because the acceptance thereof would be void. Thus, there will be no right to appraisal for either the Class A or Class B shares in the present action. If they have violated such a statutory mandate, the Court will, however, be concerned with whether or not appraisal rights will accrue to the Class B shareholders upon another renewal vote. Both plaintiffs and defendants are imbued with the notion that the Court can presume the outcome of such a revote. As already mentioned, if plaintiffs were entitled to vote, the acceptance of the amendment is void and no appraisal rights can accrue thereon. Also, the Court does not have the right to vote the Class B stock of the parties. In any event, defendants' conclusion that the measure would have failed by a vote of 1510 to 690 is unwarranted. Defendants assume that all plaintiffs' Class A and Class B stock would have been cast against the measure and do not include their own Class B shares in the vote. The Court cannot be at liberty to presume how defendants would have voted their Class B stock, but if they had voted against it, the amendment would probably have passed as they were the holders of a majority of both Class A and Class B shares.

If defendants have not unlawfully taken away plaintiffs' voting rights, the Court will turn its attention to whether defendants' motion will be allowed as to the issues of whether the conduct of defendants was in bad faith and whether

defendants are bound by an alleged voting agreement.

■ The plaintiffs contend that extension of corporate life is a fundamental change and cannot be made without the consent of all shareholders. The defendants have no quarrel with the principle as stated. The cardinal rule upon the shareholder's right to vote was established in Berger v. Amana Society, supra, 95 N.W.2d at pp. 913, 914:

"We think the true rule is thus expressed in 18 C.J.S. Corporations § 496, page 1174: 'A radical and fundamental change in the objects, purposes, or business of the corporation interferes with the contract rights of each stockholder with the corporation and cannot be made without the consent of all stockholders, except by virtue of some act of legislation which may be read into the contract of incorporation; * * *'. Our problem here is to determine whether the amendments attempted in 1955 are within the class permitted by the provisions of the charter or the corporation laws of Iowa."

■ The relation between a corporation and its shareholders is contractual. See Berger v. Amana Society, supra; Bishop v. Middle States Utilities Co., 225 Iowa 941, 282 N.W. 305; Ontjes v. Bagley, 217 Iowa 1200, 250 N.W. 17. In determining the agreement, the statutes governing corporations, their organization, and all of the provisions of the charter are a part of the contract. Berger v. Amana Society, supra.

The plaintiffs contend that the Articles of Midwest do not expressly state that Class B stock cannot vote on renewal. The portions of the Articles of Midwest material to the contractual arrangement must be set out. Article V provides that:

"The voting power shall be vested exclusively in the Class A common stock and each share of Class A common stock shall be entitled to one vote in person or by written proxy at all annual or special meetings of the Cor-

poration, or on matters in which the stockholders are entitled to vote. At all meetings of the stockholders of the Corporation or on any matter in which the stockholders are required or permitted to give consent, a majority of the common stock outstanding and entitled to vote as aforesaid * * shall constitute a quorum. * * * unless otherwise herein specifically provided. * * * Except with reference to voting rights, Class A common stock and Class B common stock shall in all respects be of equal rank and priority."

Article VI provides:

"The stockholders entitled to vote at the annual meeting, or whenever a board of directors is to be lawfully elected, shall determine the number of directors to be elected, within the limits hereinbefore set out. * * * The directors of the Corporation, who need not be stockholders thereof, shall be elected at the annual meeting of the stockholders, as hereinafter provided."

Article VII declares that:

"Special meetings may be called by the President or the board of directors, or by a majority of the voting stock by written consent and on twenty (20) days' written notice."

Article IX proclaims that the stockholders holding a "majority of voting stock of the corporation outstanding and entitled to vote" may make an "adjudication" in respect to indemnification granted to directors against certain liabilities when directors not incurring liability do not constitute a majority of the board.

Article X determines that:

"The private property of the stockholders of this corporation shall not be liable for corporate debts, and this Article shall not be amended or changed except by the unanimous consent of all the stockholders of the corporation in writing."

Article XI makes provision for amendment of the Articles by stating that:

"These Articles of incorporation, except Article X may be amended at any time by a vote of a majority of the voting stock of the corporation outstanding, at any regular meeting of the stockholders or any special meeting called for that purpose."

Article II reads as follows:

"The corporation shall commence business as soon as a certificate is issued by the Secretary of State of the State of Iowa, and shall continue for a period of twenty (20) years, with power of renewal, unless sooner dissolved by the vote of a majority of the voting stock then outstanding. * * * "

■■■ The issue is "the intent of the parties in making the contract which the plaintiffs hold with the corporation." *Berger*, supra, 95 N.W.2d at p. 914. It is manifest from the Articles that the intent of the parties was to bestow voting rights only upon the holders of Class A stock except as to Article X relating to personal liability of shareholders.

Article V is unambiguous in vesting voting rights *exclusively* in Class A stock with one vote per share "at all annual or special meetings of the corporation, or on matters in which the stockholders are entitled to vote." Article V then provides that a "majority of the common stock outstanding and entitled to vote" constitutes a quorum on matters in which the stockholders "are required or permitted to give consent * * * unless otherwise herein specifically provided." The plain inference of the latter provision is that because only stockholders entitled to vote can constitute a quorum, only their shares may vote at all unless otherwise provided. Such a provision is typical of articles limiting voting rights. See Buxbaum, Preferred Stock—Law and Draftsmanship, 42 U.Cal.L.Rev. 243. The exception to the exclusive quorum and voting rights provisions for Class

A stock is Article X. Also, Class A common stock and Class B common stock are stated to be exactly the same except they are specifically differentiated as to voting rights by Article V.

As if any further clarification of the Articles were needed upon this matter, Article XI provides that *"These Articles"* may be amended by a majority vote of the "voting stock" with the exception of Article X. Thus, it is plainly contemplated that only voting shares may vote on amendments to the Articles with the above exception.

Plaintiffs seek to draw comfort from the fact that Article II does not mention "by the vote of a majority of the voting stock" after providing for renewal as it does in the case of dissolution in Article II, issuance of additional stock in Article V, indemnification in Article IX, and amendment of the Articles in Article XI. It is fruitless to urge such a proposition in light of the foregoing discussion. The exception is the situation in which Class B stock has a right to vote. The Articles expressly provide that Class A shares have sole voting privileges upon all matters, including amendments to the Articles. It would be utterly inconsistent and a mastication of the plain words of the Articles to say that stock which always has exclusive voting rights is denied such rights merely because such rights are not mentioned as to the specific matter. It is equally implausible to say that Class B stock which never has voting rights is granted such rights as to a proposal due to failure to mention that the Class A stock has exclusive voting rights as to the specific subject.

Moreover, renewal necessitates an amendment to the Articles. Amendments to the Articles are already covered in a separate Article. The matters pointed out by plaintiffs are effectuated without amendment. Each subject is covered in only one place in the Articles. The draftsmen of the Articles were entirely reasonable to draft one Article as to voting rights on all amendments but to take the precautionary measure of directing attention to such rights as to each one of these other matters.

In summary, the Articles of Midwest expressly deprive Class B stock of voting rights as to extension of the corporation's activity beyond the stated period.

In the *Berger* case, supra, the Supreme Court of Iowa held that Section 491.20 of the Code of Iowa, which is a general provision relating to amendments to articles of incorporation, would probably not permit a substantial change in the corporate purposes and structure and the same would be true here. See also 7 Fletcher, Cyclopedia of the Law of Private Corporations, Section 3726 (1958 ed.). But the Court felt that the real issue was the intent of the parties. As previously noted, the intent of the parties herein was to permit amendment to the Articles authorizing extension without unanimous consent.

However, there is an additional element in the case at hand which was not involved in *Berger*. That is, that Section 491.25 specifically relates to renewal. The general provision in regard to amendments was all that confronted the Court in *Berger*.

The plaintiffs argue that if the Articles of Midwest permit renewal without the vote of the Class B shares, then the Articles must be struck down because they are in conflict with Section 491.25.

Plaintiffs place strong reliance upon the recent case of Woodward v. Quigley, 257 Iowa 1077, 133 N.W.2d 38 (1965). In that case, a resolution was adopted by a majority of all shareholders. The majority stockholders instituted a suit under Iowa Code, Section 491.25, for a judicial determination of the real value of the minority shareholders' stock as the parties were unable to agree on its valuation. The Court held that the stock was to be valued as in a going concern. The Court held that the real value could not be discounted by a broker's commission and because of the fact that the shares represented a minority interest.

The Court elaborated on pp. 42–43 of 133 N.W.2d that:

"We also believe that consideration of such factors would negative one of the main purposes of section 491.25. The original statute was similar to those enacted in most states to modify the common law rule which required unanimous consent of all the stockholders for a substantial change in the corporate structure. The increase in the number of corporations and stockholders made such a rule impracticable. The statute was enacted to permit a majority to vote to renew the corporate life and at the same time allow a dissenting minority to get out of the corporation with the 'real value' of its stock. It prevented the minority from being squeezed out for a lesser price.

The U. S. Supreme Court discussed this type of statute in Voeller v. Neilston Warehouse Co., 311 U.S. 531, 61 S.Ct. 376, 85 L.Ed. 322 and in speaking through Justice Black said:

'At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by a majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted.' "

Defendants urge that the first portion of the discussion relating specifically to Section 491.25 was dicta. The Court cannot agree. General expressions of opinion, which are not essential to the disposition of the case, cannot control the judgment in subsequent cases. Coen v. American Surety Co. of New York, 120 F.2d 393 (8th Cir.), cert. den. 314 U.S. 667, 62 S.Ct. 128, 86 L.Ed. 534 (1941). Although what has been said in a decision should be limited to the facts of the case under scrutiny and should not be extended to cases where the facts are essentially distinguishable. Mutual Benefit Health & Acc. Ass'n v. Cohen, 194 F.2d 232 (8th Cir.), cert. den. 343 U.S. 965, 72 S.Ct. 1059, 96 L.Ed. 1362 (1952), Courts should be guided by principles embodied in previous decisions. Kansas City Life Ins. Co. v. Cox, 104 F.2d 321 (6th Cir.).

In *Woodward*, supra, the Supreme Court of Iowa was compelled to decide what factors were inherent in the real value of stock as in a going concern under Iowa Code Section 491.25. It was necessary to examine the purposes of that Section in order to determine what factors should be reflected in the value of the stock. It is irrefutable that the Court laid down the principle that "The statute was enacted to permit a majority to vote to renew the corporate life and at the same time allow a dissenting minority to get out of the corporation 'with the real value' of its stock."

The dual purposes of the statute are inseparable. The statute was promulgated to accomplish both objectives. It was imperative for the Court to view the historical background behind the enactment in order for the reader to fully understand why the majority was permitted to renew by paying the dissenting minority for their shares.

Even if the quoted language could be considered as dicta, this Court would be constrained to abide by it. The Court's duty is to apply state law and this dicta is suggestive as to what the Iowa Supreme Court would probably hold in the instant case. See *Mutual Benefit Health & Acc. Ass'n*, supra.

As the Iowa Supreme Court concluded, appraisal statutes were in general enacted to modify the common law rule of unanimous consent. As stated in Lattin on Corporations at p. 516 (1959 ed.):

"The *great majority* of appraisal statutes were not intended to do more than permit shareholders who disagreed with the fundamental change

to have their interests purchased and to retire from the company." (Emphasis supplied.)

Defendants cite the case of Robbins v. Beatty, 246 Iowa 80, 67 N.W.2d 12 (1954) as authority for their position that extension is not a radical change. That case merely stands for the proposition that stock must be legally voted in order to fall within the statutory shield of protection. It does not grapple with the problem of whether renewal is of such a substantial character as to warrant voting rights.

The Court is not unaware that the weight of authority does not regard renewal as a serious alteration of the corporate existence. See, e. g., State ex. inf. Dalton ex rel. Holekamp v. Holekamp Lumber Co., 340 S.W.2d 678 (Mo. Sup.Ct.1960); Garzo v. Maid of the Mist Steamboat Co., 303 N.Y. 516, 104 N.E.2d 882; Drew v. Beckwith, Quinn & Co., 57 Wyo. 140, 114 P.2d 98, 115 P.2d 651; Flowers v. Pecos R.R. Co., 138 Tex. 18, 156 S.W.2d 260; Loeffler v. Federal Supply Co., 187 Okl. 373, 102 P.2d 862; 18 Am.Jur.2d, Section 71; 13 Fletcher, Corporations, Section 5788 (1958 ed.). A review of the above decisions discloses, that most of them involved much stronger situations for the adoption of the non-fundamental rule. Many involved constitutional attacks on the statutes authorizing renewal. For example, it was related by the Court in *Drew* in 114 P.2d at 107 that "The least that could be said is that it is not clear that the change is so fundamental that it should be declared in violation of the constitution * * *."

In some cases, the Courts have felt that extension was more than just a projection of the corporate existence. See Hanks v. Borelli, 2 Ariz.App. 589, 411 P.2d 27 (1966); Federal Deposit Ins. Corp. v. Beasley, 193 Ga. 727, 20 S.E.2d 23 (1942); Pratt v. South Pueblo Building and Loan Association, 1 Colo.N.P.Dec. 171. In the *Pratt* case, the company was organized, as here, to exist for twenty years. The Court stated that "the time limited for its existence was of the very essence of the contract."

It would appear then that there were cases which were to the effect that extension was of substantial importance. But even if the legislative aim was not to abrogate the common-law unanimous consent rule, it was evidently felt that extension was of crucial importance in Iowa. Professor Lattin described the historical developments behind appraisal statutes as follows:

"This rule of unanimous action had some validity in the small, closely-held corporation which, in many respects, functioned informally, as if it were a partnership, with its owners, as 'employees,' devoting their full time to the business, as partners quite customarily do. When the closely-held corporation became less closely held, however, so that there were owners who did not actively participate in carrying on the business and who were more interested in productive investments than in keeping the family corporation within its previously established bounds, there arose a need for a more democratic approach. This involved choices which depended upon policies, which in turn, depended upon local tradition, which, in many states, reflected the type of corporation carrying on business within its borders —either small and closely-held or larger and publicly-held." Lattin, Minority and Dissenting Shareholders' Rights in Fundamental Changes, 23 Law and Contemporary Problems 307, 308–309.

Iowa was basically an agrarian state at the time the initial statute was enacted in 1851 and its corporate enterprises consisted primarily of small, closely-held ventures. The duration of corporate life was fixed at twenty years.

The *Drew* case, which is the leading authority for the rule that extension is non-fundamental, in 114 P.2d at p. 104, says of the *Pratt* decision:

"It may be conceded that opportunity for such argument is offered in a

case where the corporate life is limited to so short a period. But suppose that a corporation is organized for 100 years. Would such an argument then have a basis? In this case it was organized for fifty years, the utmost limit permitted under our statute. If a young man of reasonable maturity, say at the age of 25, were to aid in organizing such a corporation, the end of the period would take him to the grave or the edge of it, and it is hardly probable that he would consider the time limit as an essential part of the contract. The very fact that 50 years, the utmost limit under the statute, is chosen would seem to negative that fact."

The author of Corporations—Reorganization—Exchange of Stock for All Assets Followed by Dissolution Constitutes De Facto Merger, 51 Iowa L.Rev. 1096 (1966) does an excellent job of analyzing the relative differences between the shareholders of a large, publicly-held corporation and the small, closely-held concern. He notes that minority shareholders in the small corporation may be desirous of active managerial duties. For example, it would be extremely unfair to deny an active participant the prerogative of a voice upon whether or not the life of the concern was to be extended. In the case at hand, the affidavits show that plaintiff Birdsall was an original incorporator of Midwest, an officer director, and was active in management until November of 1965. John A. Cloos has been active in Midwest from 1953, the date of incorporation, as an employee and director.

 Since the *Woodward* case determined that Section 491.25 was enacted in order to negate the harsh common law rule of unanimous consent and provide for majority rule, plaintiffs were entitled to vote. The statute merely removed their dictatorial veto power.

Therefore, defendants can gain no comfort from the fact that Iowa is listed as one of the four states permitting appraisal upon renewal. 2 Model Business Act, Annotated, p. 387. Nor

can their position be bolstered by the fact that extension was not viewed of sufficient concern to warrant voting rights, regardless of the Articles, in the M.B.A. and Code of Iowa, Chapter 496A.

Although one might question whether extension is such a radical event as to merit voting rights for nonvoting shares, there is no question that such stock has voting rights on serious corporate affairs. See Code of Iowa, Chapter 496A, Section 496A.57.

It would appear to be valuable to explore the origin and utilization of the nonvoting stock device. Like appraisal statutes, the appearance of nonvoting stock is inextricably woven into the progression of the corporation from the "partnership" entity to the "management-investment" concept. Bergerman, Voting Trusts and Non-Voting Stock, 37 Yale L.J., 445, 449–450 (1929) relates:

"The average stockholder in the modern corporation is an investor who is willing to take the earning power of the company as his only security and is willing to forego steady income for possibilities of greater gain.

The reluctance of stockholders in general to exercise their voting privilege is a familiar aspect of modern corporate management. The fact is that they are not, and do not consider themselves part of the management. Non-voting stock and voting trust certificates are sold without difficulty to the investing public."

However, by the use of non-voting stock "the influence of the stockholder's vote as a check on management is eliminated." Ibid. The author raises the possibility that separation of power and ownership would result in fraud or misconduct in management, especially in the situation of a minority control group having a small financial stake. To be weighed against this possibility are:

" * * * first, *continuity of management*, with the advantages that flow therefrom, the formation of personal connections, increasing familiarity

with the details of the business and the like; second, *unvaried long-time policies.*" Id. at p. 466.

■ Therefore, nonvoting stock is a method of denying voting power to certain classes of stock in order to achieve a desirable control-investment allocation. See 1 O'Neil, Close Corporations, Section 319, as to possible uses of such stock. It is entirely legal to make provision for nonvoting stock, unless barred by positive law. 5 Fletcher, supra, Section 2026.

Bergerman, supra, at p. 467, concludes by stating that:

"* * * it may be said that the law has accepted this kind of minority control as a fact and has developed along lines which result in throwing fundamental safeguards around the interests of those out of power." Id. at p. 467. See also 1 O'Neil, supra, Section 3.20.

Indeed, it would appear that the policy considerations for permitting nonvoting stock to vote on fundamental affairs are more persuasive when the corporation is closely-held. Many shareholders in such a corporation are likely to own both voting and nonvoting shares so the esoteric nonvoting stock justification based upon the control-investment gulf in the large, publicly held corporation becomes less important. The stockholders of the limited enterprise are often engaged in managerial activities and are key employees. It is difficult to envision such shareholders being excluded from a full voice on extraordinary corporate matters, even though the voting-nonvoting stock allocation would seem to be a legitimate means limiting their control of day-by-day activities. This reasoning is equally applicable to renewal which may be of major concern to stockholders upon entering a small enterprise.

The market for stock of the closely held concern may be largely non-existent. See 51 Iowa L.Rev., supra. It would seem only equitable that such stock should be given voting rights if only to allow the stockholders to benefit from an impartial appraisal. Numerous appraisal statutes extend only to stock which has voted against a fundamental change. Otherwise, the nonvoting shareholder has two alternatives: Leave his investment in a corporation with a possible indefinite duration, or sell his stock for an unconscionably low price.

In summary, the *Woodward* case decided that Section 491.25 was enacted to mitigate the unanimous consent rule on radical alterations in favor of a more practicable rule. Such a rule is rationally applicable to nonvoting stock.

■ The longevity of corporate existence "is a matter which prima facie concerns the state only * * *." Smith v. Eastwood Wire Mfg. Co., 58 N.J.Eq. 331, 43 A. 567, 568. See also Holekamp, supra; Drew, supra; Keetch v. Cordner, 90 Utah 423, 62 P.2d 273, 108 A.L.R. 52. And as stated in 18 C.J.S. Corporations § 79:

"The charter of a corporation cannot be extended or renewed for a period beyond that for which it was created, either before or after the expiration of such period, except by or under a valid statutory provision therefor * * *. Under statutes in many jurisdictions * * * a corporation may, by complying with the statutory requirements, extend its corporate existence before the expiration of the period fixed by its charter * * *." See also 18 Am.Jur.2d, Section 87.

■ When there is a conflict between the corporate charter and the Constitution or a statute of a State, the charter must yield to them. See State by Furman v. Jefferson Lake Sulphur Co., 36 N.J. 577, 178 A.2d 329, cert. den. 370 U.S. 158, 82 S.Ct. 1253, 8 L.Ed.2d 402 (1962); Petition of Collins-Doan Co., 3 N.J. 382, 70 A.2d 159, 13 A.L.R.2d 1250. The Articles of Incorporation of Midwest are clearly in conflict with Section 491.25. The Articles permit extension by vote of only the voting stockholders. Section 491.25 requires extension by a majority of all

stockholders. As stated by Opinion, Iowa Attorney General, March 1, 1955, at p. 26: "This statute (491.25) is not the subject of contract as between the corporation and its stockholders." Therefore, the Articles must fall in that respect.

The parties raised the question of whether nonvoting stock comes within the purview of the Section 491.25 appraisal remedy. The Court does not decide that issue in light of the foregoing discussion. However, it does feel that it should illuminate a few of its thoughts on the issue. See Rath, supra.

■■■ Defendants have earnestly urged that the Section 491.25 rights must be confined to shares "voted against such renewal." The Court is in accord with this view. This does not mean, however, that nonvoting shares should be excluded from the ambit of its protection.

Section 491.25 grants the power to renew corporate existence if a "majority of votes cast" are in favor of renewal and "if those voting for such renewal will purchase at its real value the stock voted against such renewal." The rules of construction in relation to this Section were set out in Robbins v. Beatty, supra, in 67 N.W.2d at p. 17:

"Plaintiffs are asserting a cause of action created by statute. They must bring themselves within its terms. Unless they do so they have no cause of action. The statute imposes liability upon defendants only to owners of stock voted against renewal—as we believe, legally so voted. Since Mrs. Robbins has not brought herself within the terms of the statute she is not entitled to recover.

This from Alexander v. Crosby, 143 Iowa 50, 54, 119 N.W. 717, 718, Ladd, J., is applicable here: 'A statute creating a liability which did not exist before ought not to be so extended as to include others than those designated or fairly within its terms.' To like effect is 82 C.J.S. Statutes § 394; 50 Am.Jur., Statutes, section 587 ("* * where a right is given by statute, only

those to whom the right is in terms given may avail themselves of its benefits.")"

■■■ It is evident that the only requirement of Section 491.25 is that the shares were voted against renewal. Any stock, voting or nonvoting, which has so been voted is "fairly within its terms." Pitman, Corporations—Are Nonvoting Shares Entitled to Appraisal Rights?, 28 Mo.L.Rev. 246, 248, states:

"Further evidence of a legislative purpose to exclude nonvoting shares from appraisal rights in the case of a sale of assets, merger or consolidation is found in a comparative reading of the procedure provided in the case of charter amendment. There, under specified circumstances, preferred shareholders adversely affected by the proposed amendment are entitled to notice and to vote as a class, 'whether by the terms of the articles of incorporation such class be entitled to vote or not.' Thus, for that special occasion their shares are voting shares, and the appraisal remedy is available, upon compliance with other conditions, to a limitedly enfranchised shareholder 'who shall not have voted in favor of the proposal.'"

The Court has only been able to discover two cases which bear any resemblance to this problem. In the case of Application of Harwitz, 192 Misc. 91, 80 N.Y.S.2d 570 (Sup.Ct.1948), the petitioners, owners of nonvoting preferred stock, petitioned the Court for an order appointing three persons to appraise their shares. Approval had been given to a sale by the corporation of stock of a wholly owned subsidiary. Section 20 of the Stock Corporation Law of New York, McKinney's Consol.Laws, c. 59, provided that upon the consent of two-thirds of the stockholders "entitled to vote thereon," the corporation could sell certain assets and that any stockholder "not voting in favor of" the sale could apply for appraisal. In 80 N.Y.S.2d at pp. 572–573, the Court relates:

"It is to be observed that preferred stockholders are not mentioned or pro-

vided for but only stockholders entitled to vote. Nonetheless, petitioners maintain that, as they view section 20 it does not limit appraisal rights to those stockholders who voted against the proposal but confers appraisal rights upon all stockholders except those who voted in its favor.

Their theory appears to be that otherwise a large class of non-voting stockholders is left powerless to protect their interest and compels submission by them to a determination in which they have no voice; that a reasonable construction of section 20 indicates a legislative intention that a shareholder should not be required to continue in an altered enterprise not acceptable to him and that he should have the right to retire and be compensated, whether or not his status was such that he could vote against the change.

This position sems to me to be untenable for if it was the legislative intent that section 20 should be applicable to non-voting stock and that non-voting stock should have the right to apply for appointment of appraisers as well as voting stock, then there was no need to include in section 20 the phrase 'entitled to vote thereon'. This seems to me to indicate a clear legislative intent to confine and limit the rights to appraisal under section 20 to voting stock only and as indicating the exclusion of nonvoting shares."

Section 491.25 does not narrowly limit its remedy to stockholders "entitled to vote thereon." The Court in *Harwitz* was not unjustified for interpreting this phrase to mean voting stock. The Iowa statute is directed at "votes cast," "those voting for," and "stock voted against," not at stock *entitled* to vote. Also, it does not appear that the parties in *Harwitz* raised the problem of whether the sale of assets was such a fundamental change as to permit nonvoting stock to vote in that instance.

Defendants properly assert that a review of the legislative history supports the fact that "voting" means "voting."

The predecessor of Section 491.25, Section 681 of the Code of 1851, allowed renewal if:

"[T]hree-fourths of the votes cast at any regular election for that purpose be in favor of such renewal, and provided also that those thus wishing a renewal will purchase the stock of those opposed to the renewal at its fair current value."

The Acts of 1909 (30th G.A., Chapter 104, Section 3) were substantially the same except that the number of votes required was changed to a majority of shares and the purchase had to be at the "real value" of the opposing shares. Then, in the Acts of 1911 (34th G.A., Chapter 74, Section 1), the language that "if those wishing such renewal will purchase the stock of those opposed thereto * * *." was deleted and the present phraseology inserted. The original statute probably meant that "those wishing a renewal," being at least three-fourths of the votes cast for such a measure, had to purchase the stock of "those opposed to the renewal," being less than one-fourth of the votes cast against the measure. The current wording of Section 491.25 was apparently meant to clarify that meaning.

■ In conclusion, plaintiffs were wrongfully denied voting rights on their nonvoting stock. See *Rath*, supra. Plaintiffs do not have any right to appraisal at this time as the acceptance of the resolution is void.

■■ The Court is under no compulsion to decide the constitutional questions raised by plaintiffs. The Court has a duty to avoid constitutional questions when the merits may be fairly decided without facing such questions. See Communist Party of United States v. Subversive Activities Control Board, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1910). The constitutional issues will not be decided where unnecessary to do

so. Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1954); United States v. Spector, 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863 (1951); Lee v. Hoffman, 182 Iowa 1216, 166 N.W. 565, L.R.A.1918C, 933; Schultz v. Parker, 158 Iowa 42, 139 N.W. 173.

Appraisal cannot arise from the invalid approval of the resolution in the case at hand. It was unnecessary for the Court to resolve the issue of whether or not plaintiffs' Class B stock could qualify for appraisal under Section 491.25 at this time. Thus, the Court has no duty to decide the constitutional validity of the statute if the Class B stock had not qualified for appraisal. Plaintiffs have suffered no injury due to Section 491.25. It is elementary that one must sustain a recognizable injury in order to pursue constitutional questions.

As has been indicated in the beginning, the subject of this Memorandum is devoted to a motion for summary judgment. Said motion for summary judgment is contained in two separately numbered paragraphs. It is definitely the judgment of this Court that the motion in its entirety and in its separate components should be overruled. It seems that further statement need not be made as it relates to the issues which are dispositive of this case. The facts necessary for the determination of whether the Board's action in denying Class B stock the right to vote are not in dispute. It is here decided that the resolution must be voided. In general, it is the law that when one party is entitled to summary judgment as a matter of law on a single issue which is dispositive of the case, other issues become immaterial. However, in this cause of action, it would seem that it would be the better practice for the Court to confine itself merely to ruling upon the motion for summary judgment and not taking affirmative action until requested.

Accordingly, it is hereby ordered that defendants' motion for summary judgment is overruled.