# IN THE COURT OF APPEALS OF IOWA

No. 15-0259
Filed April 6, 2016

CRAIG P. DAMOS,
    Plaintiff-Appellant,

vs.

THE WEITZ COMPANY I, INC., an Iowa corporation n/k/a TWC I, LLC, an Iowa limited liability company; THE WEITZ COMPANY II, INC., an Iowa corporation, n/k/a TWC II, LLC, an Iowa limited liability company; THE WEITZ GROUP, LLC, an Iowa limited liability company; THE WEITZ COMPANY LLC, an Iowa limited liability company; and ORASCOM CONTRUCTION INDUSTRIES S.A.E., a/k/a ORASCOM CONSTRUCTION INDUSTRIES COMPANY, an Egyptian joint stock company,
    Defendants-Appellees.
_____

    Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan (trial) and Eliza J. Ovrom (summary judgment), Judges.

    A former CEO appeals from an adverse judgment on his breach-of-contract claim against his former employer and his tortious-interference-with-contract claim against the company that purchased his former employer. **AFFIRMED.**

    Steven P. Wandro, Kara M. Simons, and Shayla L. McCormally of Wandro & Associates, P.C., and Glenn L. Norris of Hawkins & Norris, P.C., Des Moines, for appellant.

    Jeffrey A. Stone and Chad D. Brakhahn of Simmons Perrine Moyer Bergman, P.L.C., Cedar Rapids, for appellee Orascom.

    Patrick M. Roby and Nicholas J. Kilburg of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellees Weitz companies.

    Heard by Mullins, P.J., McDonald, J., and Scott, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**MCDONALD, Judge.**

Craig Damos asserted a breach-of-contract claim against The Weitz Company and its related entities for their failure to pay him in accord with various contracts between the parties. Damos asserted a claim of tortious interference with contract against defendant Orascom Construction Industries for its alleged involvement in preventing payment. Following a bench trial, the district court dismissed Damos's claims. We affirm the judgment of the district court.

I.

Plaintiff-appellant Craig Damos is the former president, chief executive officer, and chairman of the board of the directors of The Weitz Company, LLC ("Weitz Company"). He owned stock in The Weitz Company I, Inc. n/k/a TWC I, LLC ("Weitz I") and The Weitz Company II, Inc. n/k/a TWC II, LLC ("Weitz II"). At all times material to this litigation, Weitz I and Weitz II were Subchapter S corporations whose employees owned all of the shares of the Weitz Group, LLC ("Weitz Group"). Weitz Group was a holding company of Weitz operating entities. Weitz Company, a commercial construction company, was the primary operating entity. Damos was employed at these entities (collectively, "Weitz" or "Weitz defendants") from 2000 to 2010.

On January 1, 2010, a set of buy-sell agreements between Weitz I and its stockholders and Weitz II and its stockholders went into effect. The agreements were identical except for the company name (i.e., Weitz I or Weitz II). In relevant part, these agreements provided:

**6.4 <u>Deferral of Excessive Payments.</u>**

(a) Notwithstanding the foregoing provisions of this Article VI, the Company and the Stockholders recognize that it is not in the best interests of the Company or its Stockholders if the annual aggregate payment obligations (including stock redemption payments and payments of principal and interest on any stock redemption notes) incurred by the Company pursuant to this Agreement result in an unreasonable burden on the working capital, equity, cash needs or debt covenant requirements of The Weitz Group, LLC in any year.

(b) Accordingly, the Stockholders agree that if the aggregate of all such payment obligations to be made in any one fiscal year exceeds an amount (the "Cap Amount") equal to the <u>lesser</u> of:

(i) ten percent (10%) of the value of all outstanding membership units of The Weitz Group, LLC owned by the Company (including the The Weitz Group, LLC membership units then being redeemed) as of the beginning of such fiscal year, or

(ii) ten percent (10%) of the book equity of The Weitz Group, LLC (including the The Weitz Group, LLC membership units then being redeemed) as of the beginning of such fiscal year, or

(iii) the maximum amount of such payment obligations that would still allow The Weitz Group, LLC to remain in compliance with its debt covenants,[1]

then all payments to be made by the Company pursuant to this Agreement during such fiscal year may, at the sole election of the Company, be reduced pro rata by the amount of such excess, so that such aggregate payments to be made by the Company pursuant to this Agreement during such fiscal year will not exceed such Cap Amount. For purposes of determining the aggregate of all such payment obligations to be made in any one fiscal year, the payments to be made on the January 31 Settlement Date will be deemed made as of December 31 of the prior year, and all other payments made will be deemed made on the date of such actual payments.

**6.5 <u>Payment of Deferred Payments.</u>**

(a) The Company shall issue a subordinated promissory note dated as of the Settlement Date in the form and substance of Exhibit "B" attached hereto and by this reference made a part hereof to evidence such deferred payment obligations for any Stock redeemed under Section 6.3 above for which payment is required

---

[1]The parties refer to the three conditions set forth in section 6.4(b)(i)-(iii) as the "limiters." We do the same.

to be deferred under Section 6.4 above. These deferred stock redemption payments shall accrue interest on the unpaid balance at a rate adjusted semiannually on June 30 and December 31 of each year based on the Wells Fargo Bank, N.A. Prime Rate on such dates. Payments deferred under Section 6.4 as to Section 6.2(d) subordinated promissory notes or under non-subordinated stock redemption notes, shall accrue interest on such deferred amounts at the interest rate set forth in such notes.

….

**10.1 <u>Alteration or Amendment.</u>**

This Agreement may be altered or amended by a writing signed by the Company and Stockholders holding two-thirds (2/3) or more in number of shares of Stock and such alteration or amendment, if so approved, shall be binding upon all Stockholders who are parties to this Agreement. No alteration or amendment made without the consent of a Stockholder may reduce the price to be paid for such Stockholder's shares of Stock or extend the payment time therefore, if such Stockholder has given notice to the Company of his or her intent to sell the shares of Stock to the Company prior to the adoption of such alteration or amendment.

Damos resigned on June 2, 2010. He entered into a separation agreement, which provided, among other things:

**6. Weitz Stock:** Except as noted below, your direct stock will be repurchased as stated in the Stockholder's Buy-Sell Agreement. . . . . Sufficient shares will be redeemed on June 15, 2010 and proceeds applied to fully repay your Wells Fargo stock loan on that date, and the balance of your shares will be repurchased in 5 equal installments over 4 years beginning July 31, 2010 and annually thereafter; otherwise in accordance with the Stockholders' Buy-Sell Agreement. Any amendments to the Buy-Sell Agreement shall apply to any of your shares which are outstanding as of the effective date of the amendment to the Buy-Sell Agreement.

On June 15, 2010, Damos redeemed 6721 Weitz I shares to repay a loan to Wells Fargo collateralized by stock. He also redeemed shares on July 30, 2010 (1135 Weitz I shares and 3431 Weitz II shares); July 29, 2011 (same); and July 31, 2012 (same). Beginning with the July 30, 2010 redemption, Damos was issued two subordinated promissory notes (one for Weitz I and one for Weitz II)

rather than immediate payment in accord with his separation agreement ("your direct stock will be repurchased as stated in the Stockholder's Buy-Sell Agreement") and the limiters of paragraph 6.4 and deferral procedure of paragraph 6.5(a) of the 2010 buy-sell agreements. The limiters prevented payment on the redeemed shares from July 2010 to July 2012.

The six subordinated promissory notes totaled $2,299,209. The notes had differing issue and payment dates:

> Note 1: $242,867.30 for sale of 1135 shares of Weitz I stock on July 30, 2010, payable on demand on January 31, 2011;
> Note 2: $734,165.38 for sale of 3431 shares of Weitz II stock on July 30, 2010, payable on demand on January 31, 2011;
> Note 3: $196,332.30 for sale of 1135 shares of Weitz I stock on July 29, 2011, payable on demand on January 31, 2012;
> Note 4: $593,494.38 for sale of 3431 shares of Weitz II stock on July 29, 2011, payable on demand on January 31, 2012;
> Note 5: $132,329.65 for sale of 1135 shares of Weitz I stock on July 31, 2012, payable on demand on January 31, 2013; and
> Note 6: $400,020.29 for sale of 3431 shares of Weitz II stock on July 31, 2012, payable on demand on January 31, 2013.

Each of the six promissory notes contained this paragraph:

> 2. Notwithstanding the foregoing provisions of this Note, payments otherwise required to be made under this Note shall be deferred (with interest at above rate) as required under Section 6.4 of the [Weitz I or Weitz II] Inc. Stockholders' Buy-Sell Agreement dated effective January 1, 2010 and as such may thereafter be amended (the "Agreement"), i.e., the deferral will be based on the Cap Amount (as defined in the Agreement) in effect at the time the payment hereunder is otherwise required to be made. Any payments so deferred plus accrued interest thereon shall be paid on the next following Settlement Date (as defined in the Agreement), subject again to the deferral provisions of said Agreement.

Throughout 2012, Weitz was in negotiation to sell the company to OCI Limited, a Cyprus company. A purchase agreement was finalized on September 30, 2012. On November 16, 2012, Weitz issued a "disclosure statement for note

exchange," asking its note holders to exchange their existing promissory notes for new "Exchange Notes." The proposed Exchange Notes amended the payment structure to pay note holders a pro-rata share of $4,500,000 annually and discontinue the use of the limiters; changed the obligor to The Weitz Group (on Damos's first two notes, the obligors are Weitz I and Weitz II; on his latter four, the obligor is the Weitz Group); and allowed for a balloon payment on July 31, 2018, to pay off the remainder of any outstanding notes. The Exchange Notes also purported to constitute a novation of any prior promissory notes.

At the same time, in the same statement, note holders were informed the company's stockholders had been asked to consider a proposal to amend the buy-sell agreements. The amendments would mirror those of the proposed Exchange Notes, with the exception that the buy-sell agreements would not provide for a balloon payment in 2018. As a result, note holders who did not exchange their older notes for Exchange Notes ("Original Note Holders") would not necessarily be repaid in full on July 31, 2018; instead, they would continue to receive their pro-rata share of the annual pool of $4,500,000.

On November 26, Damos voted against the proposed sale and declined to exchange his notes. The sale was, however, approved by stockholders. On November 28, Weitz amended its buy-sell agreements in anticipation of the sale to OCI Limited. As amended in 2012, the buy-sell agreements read, as relevant here:

> **6.4 Deferral of Payments.**
> ….
> (b) The Company, the Stockholders and the Note Holders agree that payments may and shall be made under Promissory

Notes and/or from distributions or payments for shares . . . first by offset against any Stock Purchase Note(s) owed by such payees to Wells Fargo Bank, N.A. or to TWG as successor in interest of such Stock Purchase Notes.

(c) In addition to payment by offset against Stock Purchase Notes as aforesaid or as otherwise allowed or required under the terms of a Stock Purchase Note, the Company agrees to make aggregate annual cash payments of interest and principal under the Promissory Notes equal to $4,500,000 (the "Annual Payment Obligation"). The Company shall pay the Annual Payment Obligation to the Note Holders annually on the closest business day to each January 31, beginning in 2013, in an amount equal to each Note Holder's pro-rata share of the Annual Payment Obligation, which shall be computed by dividing the then (as of such payment date but prior to payment) unpaid principal and accrued interest balance of that Promissory Note by the then (as of such payment date but prior to payment) aggregate unpaid principal and accrued interest balances of all the then-outstanding Promissory Notes.

(d) Each Original Note Holder agrees that TWG [The Weitz Group] is the sole obligor under each Original Note and releases and waives any claims or rights against the Company, and, except for continuing obligations under such Original Note Holder's Promissory Note(s), TWG, or their affiliates and their current or former employees, officers, directors and/or managers. Each Original Note, as amended by the provisions of this Section 6.4, is the sole agreement between TWG and the Original Note Holder as to the debt evidenced by his/her Original Note, and no other agreements, written or oral, shall apply to vary the terms thereof. The provisions of this Section 6.4 supersede, replace and constitute a novation of any term of each Original Note that is inconsistent with this Section 6.4.

(e) For purposes of the Original Notes, the "Cap Amount" shall be deemed to be the Annual Payment Obligation.

(f) If any term or provision of this Section 6.4 is determined to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Section 6.4. Further, the determining authority shall be empowered and required to modify such invalid, illegal or unenforceable term or provision so that such term or provision may be effectively as originally contemplated to the greatest extent possible.

The 2012 amendments also "terminated and deleted" all the other sections of the 2010 buy-sell agreements, including section 10.1, with the exception of certain sections in article XII. Damos voted against the

amendments, but more than two-thirds of stockholders approved the amendments. This was all that was required for the amendments to be effective pursuant to section 10.1 of the 2010 buy-sell agreements.

On December 6, 2012, Damos demanded payment of his promissory notes, requesting $2,403,622. He claimed the sale of the company made the deferral provisions of section 6.4 of the 2010 buy-sell agreements inapplicable. Weitz I and Weitz II refused payment, contending the modified payment provisions of the 2012 amendments applied to Damos's notes. On December 13, 2012, Weitz I and Weitz II sold all their shares in Weitz Group to OCI Limited.

At that point, the parties were already engaged in litigation. On October 3, 2011, Damos had filed suit alleging breach of contract against the Weitz companies for undervaluing his stock repurchases after the initial 2010 repurchase. In a July 31, 2012 ruling, the district court granted the Weitz companies' motion for summary judgment on that claim and dismissed them from the case.

As relevant here, in his substituted fourth amended petition filed on March 22, 2013, Damos asserted a claim for breach of contract against the Weitz companies for failure to pay the promissory notes issued when he redeemed his stock. He also asserted a claim for tortious interference with contract against Orascom Construction Industries Company (OCI), the Egyptian parent company of OCI Limited.

The claim for breach of contract against the Weitz defendants and the claim for tortious interference against OCI were tried to the court on October 27--

28, 2014. At trial, the Weitz defendants argued section 10.1 of the 2010 buy-sell agreements did not apply to Damos's notes because the 2012 amendments deleted section 10.1. Damos argued he was not bound by the 2012 amendments. The court concluded Damos was bound by the 2012 amendments. The court concluded section 10.1 did not apply to Damos's notes because section 10.1 applied only to shares of stock, not to promissory notes. The court then considered and rejected all of Damos's arguments concerning the 2012 amendments. It also rejected his argument the Weitz defendants violated Iowa Code sections 489.405 and 490.640 (2011) when they made distributions to stockholders after the sale to OCI Limited without first paying their outstanding debts to note holders such as Damos. Having determined the Weitz defendants had not breached their contract with Damos, the court dismissed the breach-of-contract claim against the Weitz defendants.

Damos argued OCI intentionally interfered with his notes during its negotiations with the Weitz companies by convincing Weitz to amend section 6.4 of the 2010 buy-sell agreements. The court rejected that argument, noting (1) it already had determined there was no breach of contract by Weitz, so there could be no tortious interference; (2) OCI was not a party to the membership interest purchase agreement between OCI Limited and the Weitz defendants; and (3) the 2012 amendments made it possible for the Weitz defendants to start paying note holders such as Damos and were initiated by the Weitz board, not forced on Weitz by OCI. The court dismissed the tortious-interference claim against OCI.

Damos appealed timely. He contends the district court erred in dismissing his claims for breach of contract claim and tortious interference. He also argues the district court erred in dismissing another breach-of-contract claim on summary judgment prior to trial.

II.

This action was tried at law; our review is for the correction of errors at law. *See* Iowa R. App. P. 6.907; *Iowa Mortgage Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013) (breach of contract); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999) (tortious interference). The district court's findings of fact are binding on appeal if supported by substantial evidence. *See NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). The evidence is viewed in the light most favorable to the judgment. *See Miller v. Rohling*, 720 N.W.2d 562, 567 (Iowa 2006). The court's conclusions of law, however, are not binding. *See NevadaCare*, 783 N.W.2d at 465.

Summary judgment rulings are reviewed for the correction of errors at law. *See Sanon v. City of Pella*, 865 N.W.2d 506, 510 (Iowa 2015). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). The evidence is viewed in the light most favorable to the nonmoving party. *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006). "A fact is material if it will affect the outcome of

the suit, given the applicable law." *Id.* "An issue of fact is 'genuine' if the evidence is such that a reasonable finder of fact could return a verdict or decision for the nonmoving party." *Id.*

III.

A.

Damos contends the district court erred in concluding he failed to prove the Weitz defendants breached their contract with him when they refused to pay the promissory notes upon his demand.

Damos first contends section 10.1 of the 2010 buy-sell agreements entitled him to payment. The determination of the intent of the parties at the time they entered into the contract is the primary goal of contract interpretation. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). The most important evidence of the parties' intentions at the time they entered into the contract is the words of the contract. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). Section 10.1 provided:

> This Agreement may be altered or amended by a writing signed by the Company and Stockholders holding two-thirds (2/3) or more in number of shares of Stock and such alteration or amendment, if so approved, shall be binding upon all Stockholders who are parties to this Agreement. No alteration or amendment made without the consent of a Stockholder may reduce the price to be paid for such Stockholder's shares of Stock or extend the payment time therefore, if such Stockholder has given notice to the Company of his or her intent to sell the shares of Stock to the Company prior to the adoption of such alteration or amendment.

Damos contends the language preventing "alteration or amendment without the consent of a Stockholder" precludes the changes made to his promissory notes. The plain language of the contract cannot bear that interpretation. The language

provides protection against alteration or amendment related to "shares of Stock." The plain language of section 10.1 does not provide any protection for holders of promissory notes.

Despite the lack of any language regarding promissory notes, Damos contends, in this context, "shares of Stock" includes promissory notes or should include promissory notes because there is no reason to offer different protections to stockholders and note holders. We agree with the district court that the contract cannot be interpreted to reach this result. "Stock" is defined in the buy-sell agreement itself as "share or shares of the common outstanding stock of the Company." "Share," under the Iowa Business Corporation Act, means "the unit into which the proprietary interests in a corporation are divided." Iowa Code § 490.140(24). "Promissory note" means "an instrument that evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds." Iowa Code § 554.9102(1)(bm). The concepts are separate and distinct. The former is an equity interest. The latter is a creditor interest. There is no legal reason and no evidence in this record supporting any legal reason why Damos's secret meaning should control. *See Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) (stating intent requires a meeting of the minds and extrinsic evidence of secret intent cannot alter the meaning of unambiguous contract language).

Damos next contends the court erred in dismissing his breach of contract claim because the Weitz defendants cannot, in his words, unilaterally change the

terms of the notes. He argues paragraph 6 of the separation agreement prevents application of the 2012 amendments to his notes. That paragraph provides:

> <u>Except as noted below</u>, your direct stock will be repurchased as stated in the Stockholders' Buy-Sell Agreement.. . . Sufficient shares will be redeemed on June 15, 2010 and proceeds applied to fully repay your Wells Fargo stock loan on that date, and the balance of your shares will be repurchased in 5 equal installments over 4 years beginning July 31, 2010 and annually thereafter; otherwise in accordance with the Stockholders' Buy-Sell Agreement. <u>Any amendments to the Buy-Sell Agreement shall apply to any of your shares which are outstanding as of the effective date of the amendment to the Buy-Sell Agreement</u>.

He asserts the amendments apply only to any shares outstanding as of the date of the amendment and do not authorize amendments to his promissory notes. This argument fails. Damos ignores the language of other documents relevant to the issue. Paragraph 2 of his promissory notes ("payments otherwise required to be made under this Note shall be deferred . . . as required under Section 6.4 of the . . . Buy-Sell Agreement dated effective January 1, 2010 and as such may thereafter be amended") specifically made amendments to section 6.4 of the buy-sell agreements applicable to the promissory notes.

Damos next argues the 2012 amendments were an illegal attempted novation of his notes. *See Klipp v. Iowa Grain Indem. Fund Bd.*, 502 N.W.2d 9, 11 (Iowa 1993) ("To establish a substitution or novation of a contract, the claimant must show (1) a previous valid obligation, (2) agreement of all parties to the new contract, (3) extinguishment of the old contract, and (4) validity of the new contract."). He does not argue a novation occurred. Rather, he argues the 2012 amendments triggered unnamed protections afforded to him by the doctrine

of novation and therefore Weitz is required to prove novation. Weitz likewise argues no novation occurred.

We agree with the parties that no novation occurred. Amendment, however, did occur, as provided for by the express terms of the notes and governing buy-sell agreements. *See Berger v. Amana Soc.*, 95 N.W.2d 909, 914 (Iowa 1959) (allowing amendments clearly contemplated by corporate documents). A corporation's governing documents are to be construed as a whole. *See Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 150 (Iowa 2011). The procedures required under the governing documents were followed, including approval by at least two-thirds of stockholders. That Damos objects to the amendments is not surprising, but we decline to privilege his dissenting vote over those of the stockholders in the majority simply because he objects to the exact outcome anticipated by all those who voted. *See DuVall v. Moore*, 276 F. Supp. 674, 679 (N.D. Iowa 1967) ("Deprivation of a stockholder's right to vote takes away an essential attribute of his property."); *cf. Berger*, 95 N.W.2d at 914-15 (concluding amendments whose effects went beyond intent of parties at the time of adoption were improper). We therefore conclude this was not an illegal attempted novation but a legal and proper amendment process.

Finally, Damos argues the court erred in not finding the failure of Weitz I and II to pay his notes following the sale before making distributions to stockholders was in violation of Iowa Code sections 489.405 (concerning LLCs) and 490.640 (concerning corporations). Damos points to sections 489.405(1)(a)-(b) and 490.640(3)(a)-(b) that provide a limited liability company or a corporation

may not make distributions to owners if, as a result, it "would not be able to pay its debts as they become due" in the usual course of business, or its assets would be less than the amount needed to pay its liabilities plus to satisfy those who would have preferential rights before making distribution if the entity were dissolved.

The district court found Weitz Group had made payments to note holders and there was no evidence it was unable to pay its debts in the ordinary course of business. Damos argues the court considered the wrong entity because the distributions to stockholders came from Weitz I and II, so in his view the analysis should have been whether those entities could pay debts before distributing to stockholders. He asserts that, under the notes, he was entitled to be paid in full by January 31, 2013 (the date on the latest notes), but Weitz I and II did not have sufficient assets to pay their debts following distribution to stockholders. We conclude the district court correctly determined Weitz I and II did not violate Iowa law by making distribution to stockholders after the sale to OCI Limited because arrangements had been made to pay the note holders in the ordinary course of business and Weitz Group had sufficient assets to pay note holders and anyone with preferential rights if the company were to be dissolved.

In sum, the district court did not err in determining Damos failed to prove his claim for breach of contract.

B.

Damos contends the court erred in dismissing his claim against OCI for tortious interference with his contract. Underlying this claim is Damos's

contention the Weitz defendants breached their contract with him. Because we conclude Damos failed to prove his claim for breach of contract, his claim for tortious interference necessarily fails. *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001) (including among elements of tortious interference claim "the interference caused [Weitz] not to perform, or made performance more burdensome or expensive").[2]

## C.

Damos contends the court erred in granting summary judgment in favor of the Weitz defendants on count I of his second amended petition, which concerns the valuation of his stock and the term "tender date" in the buy-sell agreement. Weitz contends error is not preserved because Damos did not file a motion to amend or enlarge following the order granting summary judgment. *See* Iowa R. Civ. P. 1.904(2); *Otterberg v. Farm Bureau Mut. Ins. Co.*, 686 N.W.2d 24, 28 (Iowa 2005) (allowing the district court to consider any claimed deficiency).

Assuming without deciding that error has been preserved on this issue, we conclude the district court did not err in granting summary judgment to the Weitz defendants on this issue. The court correctly concluded there was no genuine issue of material fact as to the meaning and application of "tender date" in the agreements, nor as to the determination of value of Damos's shares. Sections

---

[2] Damos does not argue OCI's involvement "made performance more burdensome or expensive." We therefore consider the argument waived. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see also Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) (stating "random mention of [an] issue, without elaboration or supportive authority, is insufficient to raise the issue for [appellate] consideration"). However, we also fail to find anything in the record supporting Damos's hypothetical argument, were he to make it.

5.1 through 5.3 of the buy-sell agreements define "purchase price," "value," and the agreed-upon procedures for valuing the shares at the end of the preceding fiscal year. Section 5.2, specifically, refers to a determination of the shares' value as of a "tender date." Section 4.1 defines "tender date" for purposes of Damos's argument. Damos contends there is only one tender date in this case: the date of the first stock sale. Damos argues all his shares should be valued as of that date.

This is incorrect. Section 4.1 provides a former employee shall sell a fraction of his or her shares "on the date he or she so terminates employment (as to such Stock, the 'Tender Date')," and shall sell a different fraction of shares on "the first anniversary of the initial Tender Date (as to such Stock, the 'Tender Date')," and shall continue doing so for several years. On each anniversary of "the initial Tender Date," a new tender date for each fraction of shares is established. This section is clear that there are multiple tender dates, and, reading the sections in conjunction, it is clear that shares are to be valued on each respective tender date.

IV.

We conclude the district court's findings are supported by substantial evidence and its conclusions are without error. We also conclude there is no disputed issue of material fact regarding Damos's "tender date" claim and Weitz Group was entitled to judgment as a matter of law with respect to that claim. For these reasons, we affirm the judgment of the district court.

**AFFIRMED.**